COLDWELL, Administrator, etc., Respondent, vs. SANDERSON
and others, Appellants.

*April 12 — June 1, 1887.*

*Mill-owners, rights of: Unreasonable use of water a question for the
jury: Costs.*

1. The owner of an upper mill on a stream has the right to construct a
   dam, and stop the natural flow of the water for such time as is
   necessary to fill up a pond or reservoir created thereby, of an area
   reasonably consistent with the size and volume of the stream, and
   to keep it full for the use of his mill; and he will be liable to the
   owner of a mill lower on the same stream, for injuries caused by
   the exercise of that right only when his use or detention of the
   water is unreasonable.

2. The owner of a lower mill who does not make use of reasonable
   means, by erecting a sufficient dam and creating a reservoir, or
   otherwise, to prevent injury to his own mill-privilege from the
   fluctuations of the stream caused by the reasonable use of the
   water by the upper mill-owner, and enable himself to make as
   good a use thereof as he might do, cannot recover for such injury,
   because it arose from his own fault.

3. Where, in an action by the owner of a lower against the owner of
   an upper mill on the same stream for wrongfully obstructing the
   flow of water, the evidence is contradictory on that subject, the
   question whether the defendant made an unreasonable or improper
   use of the water is one for the jury.

4. The court will decline to receive a brief which is discourteous and
   disrespectful to the counsel for the adverse party, and will not
   allow any costs to be taxed therefor.

APPEAL from the Circuit Court for *Dane* County.

The case is sufficiently stated in the opinion.

For the appellants there was a brief by *Lewis & Hard-
ing,* attorneys, and *W. A. Corson* and *I. C. Sloan,* of counsel,

and oral argument by *H. M. Lewis* and *I. C. Sloan*. Among other things, they contended that the defendants had a right to keep back the water for a reasonable time, with due regard to all the circumstances of the case. *Mabie v. Matteson*, 17 Wis. 1; *Thurber v. Martin*, 2 Gray, 394; *Davis v. Winslow*, 51 Me. 290; *Parker v. Hotchkiss*, 25 Conn. 321; Wood on Nuisances, sec. 414; *Bullard v. Saratoga Victor Mfg. Co.* 77 N. Y. 525; *Gould v. Boston Duck Co.* 13 Gray, 453; *Platt v. Johnson*, 15 John. 213; *Dumont v. Kellogg*, 29 Mich. 420; *Hoy v. Sterrett*, 2 Watts (Pa.), 327; *Buchanan v. Grand Riv. Log Co.* 48 Mich. 364; *Whalen v. Ahl*, 29 Pa. St. 98; *Hoxsie v. Hoxsie*, 38 Mich. 77; Angell on Watercourses, 117–119. If the injuries complained of were caused by the inadequacy of the plaintiff's pond or head-race, or both, he could not recover. *Timm v. Bear*, 29 Wis. 255; *Miller v. Sherry*, 65 Wis. 129; *Jacobs v. Allard*, 42 Vt. 305; *Springfield v. Harris*, 4 Allen, 494; *Brace v. Yale*, 10 id. 444; *Merritt v. Brinkerhoff*, 17 Johns. 324. The defendants' use of the water was reasonable. *Vliet v. Sherwood*, 35 Wis. 236; *Keeney v. Wood Mfg. Co.* 39 Conn. 576; *Pitts v. Lancaster Mills*, 13 Metc. 156; *The Oregon Iron Co. v. Trullenger*, 3 Oregon, 1; *Pollitt v. Long*, 3 N. Y. Sup. Ct. (T. & C.) 232; *Platt v. Johnson*, 15 Johns. 213; *Davis v. Getchell*, 50 Me. 602; *Wadsworth v. Tillotson*, 15 Conn. 366; *Snow v. Parsons*, 28 Vt. 459; Wood on Nuisances, secs. 367–371 and 414; *Brown v. Illins*, 27 Conn. 84.

*H. W. Chynoweth*, for the respondent, argued, among other things, that the owner of a lower mill was entitled to the use of the water in the stream, without diminution or obstruction. *Timm v. Bear*, 29 Wis. 255; *Tyler v. Wilkinson*, 4 Mason, 397; *Lawson v. Mowry*, 52 Wis. 236; *Cowles v. Kidder*, 24 N. H. 364; *Davis v. Fuller*, 12 Vt. 178; *Gilman v. Tilton*, 5 N. H. 231; *Washburn v. Gilman*, 64 Me. 163; *Phillips v. Sherman*, 64 id. 171; *Clark v. Rockland Water Power*, 52 id. 68; *Lancey . v. Clifford*, 54

id. 487; *Stickney v. Munroe,* 44 id. 195; *Panton v. Norton,* 18 Ill. 496; *Van Hoesen v. Coventry,* 10 Barb. 518; *Douglass v. State,* 4 Wis. 387; *Knoll v. Light,* 76 Pa. St. 268; Wood on Nuisances, secs. 335, 346, 347; Angell on Watercourses, sec. 95; Washburn on Easements, 326, 334; Gould on Waters, sec. 209. The verdict settled the question whether the injury was caused by the condition of the plaintiff's head-race and dam.

The following opinion was filed May 15, 1886:

ORTON, J.  This action was brought by the respondent, as the owner of a mill on Black Earth creek, against the appellants, as owners of a mill above on said stream, for unreasonably withholding the water of said creek from the plaintiff's mill, between the 9th and 22d days of January, 1884, to his damage.  Black Earth creek is a stream rising in the western part of Dane county, in Mud lake, and running north-westerly, by the villages of Cross Plains and Black Earth, to the village of Mazomanie, and thence westerly to the Wisconsin river, in the county of Iowa. It has many tributary streams and springs, and its general stage of water is quite permanent, and affords quite a number of eligible water-powers.  The first dam and mill are at Cross Plains, with a 14-foot head, and a 36-inch wheel; the second are at Black Earth, with an 8-foot head, and three wheels, aggregating ninety-six and one-half inches; the third, and four miles below, are at Mazomanie, with a 19-foot head, and two wheels, aggregating seventy-four and one-half inches; the fourth mill is about half of a mile below, and has no dam, the water being taken from the natural flow of the stream; and the fifth mill, and the last of present concern, has a dam only three feet high, constructed of loose stones and timber, and uneven at the top, through which considerable water passes, at the foot of a large number of bayous, sloughs, and bogs, over a wide, marshy

space; and from this dam there is a head-race eighty rods in length, passing, across a southern bend in the river, to the bulk-head or flume, of a head of about eight feet. Here stands the plaintiff's mill, with two wheels, aggregating eighty inches, and with two or more run of stones for the grinding of grain. The race has been gradually filled up in places, with earth and stones, and at one place by stones fallen from a broken arch, and at another place by a timber below the surface of the water, so as to lessen or impede, to some extent, the volume of water which first passed through it when originally constructed; and there is a wastage of water around the head of the race into the main stream, and at a low place in the head-race, near the mill, and through the dam, to considerable extent. The stream, between the mill of the plaintiff and the mill of the defendants at Mazomanie, a distance of about three miles, is very crooked, and in many places skirted with low grounds, so that in times of a high stage of water the river is shallow and quite wide. Between the 9th and 22d days of January, 1884, the time of the alleged injury, the temperature was very low, and the cold intense, the thermometer at one time 20 deg. below zero, and the river between these mills was deeply frozen, and in many places the ice formed from three to six feet deep, and it was shoved out and over the usual boundaries of the stream, and over and on the marsh and low lands, and in some places the water was frozen to the bottom. The water in the plaintiff's head-race was frozen so that the ice on the surface was about eight inches deep, and when the plaintiff's mill was in operation the water beneath was drawn down, which caused the ice to fall in and break near the center, and so lie in a shelving form from either side. When more water was allowed to come down, by the running of the defendant's mill, much of it passed over the ice in the race, and some under it.

It was claimed by the plaintiff, and the evidence offered

in his behalf tended to prove, that on the said 9th day of January the defendants started up their mill for the first time in some days, and ran it only in the day-time, and shut off the water in the night, and kept it back from passing down to the plaintiff's mill for many hours each day, and that, by such unreasonable use of the water at such a time of intense cold, by the defendants, the plaintiff was rendered unable to run and have the use of his mill for many hours each day during said time, to his damage, and such damage was sought to be proved by the diminution of the products of the mill. The testimony taken is very voluminous, and, touching many facts, was very contradictory. As to the amount of water used by the defendants' mill, and as to whether the gates were shut down so as to stop the natural flow of the water when the mill was not running, and as to the amount of water which passed through their dam and other places, and as to the effect of the ice upon the stream below in diminishing the flow, and as to many other pertinent and material questions, there was a vast amount of evidence and considerable conflict. The average natural volume of the stream, at and below the defendants' mill, was estimated by the expert testimony for the plaintiff at a little over 2,000 cubic feet per minute, and by the expert testimony for the defendants at over 3,000 cubic feet per minute, and the estimate for the plaintiff on the subject was criticised as having been made on the theory that the large pond of the defendants, covering over fifty acres, stands at a dead level over its entire area, when there is the natural flow of the stream through the open gates of the mill; and, on the other hand, the expert testimony for the defendants was criticised as being upon false theories and *data*.

In view of the testimony, and its contradictory character in reference to all of these questions, the case, although complicated and not made out for the plaintiff with great

certainty or clearness, was one peculiarly within the province of the jury to decide. There being no special verdict on any of the contested questions of fact, we cannot know what facts were found from which the jury formed their conclusion that the defendants' mill, and its operation during the time aforesaid, caused the damages. Whether it was because the defendants' machinery was greater than the capacity of the stream would justify, or that it was not operated in a reasonable manner at such a time, or that the natural flow of the stream was unreasonably withheld and prevented, or in what particulars, we cannot know. We think we must say that there was some evidence that would have warranted the verdict for the plaintiff for damages, on some of these theories; and, if this was all there was of the case, we should not feel warranted in disturbing it.

But there is another question, vitally important in this case, and in all other similar cases; and that is, was not the plaintiff's damage caused mainly or entirely by the insufficiency of his own works? He does not complain as a mere riparian proprietor, using the water in the natural flow of the stream for ordinary uses, but as a mill-owner upon a hydraulic power capable of propelling machinery. He has what is commonly called a mill privilege, by reason of the natural fall in the stream, and he must avail himself of it by the usual means of obtaining a head of water, and a steady and uniform flow and volume of water, necessary to its profitable use for a mill. Very few streams would be of any use for hydraulic machinery without dams and ponds or reservoirs, and the law, as well as common usage, recognizes the right of the riparian owner to construct a dam, and temporarily stop the natural flow of the stream, to fill up such a pond or reservoir, of area reasonably consistent with the size and volume of the stream. This principle is well declared in the charge of the learned judge in this case, as follows: "There may be a diminution in quantity

or a retardation or acceleration of the natural current, indispensable for the general and valuable use of the water, perfectly consistent with the common right." And, again: " It is a reasonable use of the stream, by one proprietor, to detain the water for such time as is necessary to fill a pond, when built or when repaired, when used in connection with machinery, which the power of the stream in its ordinary stages is adequate to propel. In times of drought, the water may be detained for such length of time as is necessary to enable it to be advantageously and profitably used for such machinery."

The same principle is recognized in the following instruction, which was approved in *Timm v. Bear,* 29 Wis. 254, the case specially relied upon by the learned counsel of the respondent for a recovery in this case, viz.: " After he [defendant] has ponded the water, he may let it through his mill in working it, in reasonable quantities, to operate his mill; and if, in so doing, he increases to some extent the velocity and quantity of water, at times, below the mill when it is in operation, or decreases it at other times when his pond is filling up, the plaintiff cannot complain *unless he uses excessive quantities of water in proportion to the capacity of the stream* and his own mill privilege, or *causes an unreasonable detention of it.*" The italics are in the opinion.

This, then, being the lawful and proper use of a stream for mill purposes, a mill privilege cannot be said to be reasonably improved, and made reasonably available, without a dam and a mill-pond in order to secure the best reasonable advantage of it. It being, then, settled as the law that the owner of the upper mill-power may construct a dam, and stop the flow of the water to fill it, and keep it full, for the use of his mill, the owner of a mere mill privilege below cannot build his mill without a dam or pond, and use the water taken from the natural current of the stream,

and require or expect that its natural flow will not or shall not be retarded, and at times suspended, by the reasonable use of the water by the upper mill-owner. He has it in his power to build a dam if there is fall enough in the stream to justify his building a mill upon it, and, by filling up his own pond, save the water from such diminution and fluctuation of the volume of the stream. If he is damaged by not doing so, it is his own fault, and he cannot complain. He must make a reasonable use of his own mill-power before he can complain of another mill-owner. This principle was also very clearly declared in the charge of the learned judge in this case as follows: "And so, too, the lower mill-owner must make a reasonable. use of his property. If he can so construct his dam and race, without too much expense and trouble, so as to obviate the difficulty, it would be his duty to do so."

The same principle is declared in the opinion of Chief Justice Dixon in *Timm v. Bear, supra,* as follows: "This situation of the plaintiff's mill, the smallness of his pond, and the impossibility of making it larger, while they are circumstances of disadvantage to the plaintiff, for which he has no cause of complaint, and cannot make them the basis of any recovery against the defendant, so long as the latter uses the water of the stream in a reasonable and proper manner, yet they are circumstances which must be taken into consideration in determining what is such reasonable and proper use. If, for example, the plaintiff's pond were as large, or capable, without too much expense and trouble, of being made as large, as that of the defendants, it is very improbable that any complaint of the kind here made would ever have been presented, or that the plaintiff would have suffered any injury from the detention or letting off of the water in the manner shown."

The same principle was recently declared by Mr. Justice Lyon in the opinion in *Miller v. Sherry,* 65 Wis. 129, in appli-

cation to that case as follows: " It is equally clear that if the dam and sheer-booms of the plaintiff were so defectively constructed and maintained that the danger of a jam of logs at the chute, and the breaking of the dam, were thereby increased, and that the faulty construction of such dam and booms directly contributed to the breaking of the plaintiff's dam, and the consequent injury, the plaintiff cannot recover." It is true that the defendant's flooding-dam above, complained of in that case, and the plaintiff's dam, sheer-booms, and mill below, were on a navigable stream, yet the principle upon which the case was decided is the same.

Such being the law, what are the undisputed facts, according to the testimony, in respect to the sufficiency of the plaintiff's dam and race, and the feasibility of their improvement so as to obviate the trouble complained of? It was not claimed on the trial or argument that the damages would have occurred without the concurrence of the ice in the stream and head-race during that particular time in January, 1884. Prof. Conover, of the state university, who stands as high and is as eminent as a civil and hydraulic engineer, and for general scientific knowledge, as any one in this state, spent much time in making a careful and critical examination and survey of this stream between the two mills, and of the mills and dams, and made accurate measurements and levels in order to be a competent expert witness in this case. After having testified as a witness about the condition of the plaintiff's dam and race, Prof. Conover was asked how far the plaintiff would cause the water to flow back if he should raise his present dam one foot, and he answered that he had taken the levels, and marked it as one-half mile above the dam, and that no more land would be thereby flowed than is at present in times of high water.

He was asked, if the plaintiff should raise his dam one foot, and lower his race one foot in certain shallow places, how it would affect the water at plaintiff's mill, and he answered

that it would very greatly diminish, perhaps entirely re-
move, the difficulty from ice. He was asked whether the
plaintiff's mill-power could be improved, and how, so as to
make it more efficient at all seasons of the year, and he an-
swered that it would be very easy to improve the power,
and that it could be done at very moderate expense, by
either raising the dam from one to two feet, or by raising
the dam and lowering the head-race. If the dam were
raised two feet, the water would not flow back much above
the railroad bridge, some distance below the defendants'
dam. The stream runs rapidly all along below that point,
and the flowage would not exceed ten acres of land. The
tail-race of the plaintiff's mill could be made a foot deeper,
as the bottom is mostly mud. If the plaintiff's pond were
deepened, and the head-race deepened, a large part of the
difficulty in regard to the formation of ice would be re-
moved, perhaps all of it.

Capt. Nader, the scientific and expert witness for the
plaintiff, testified that if the plaintiff lowered his head-race
one foot, raising the dam at the same time, there would be
an abundance of water. It would give freer access of the
water to the tail-race and to the mill, I would say, if it came
down there. Any amount that he would raise the dam
would assist him in storing water if there was any water
supply. I could not say how much land would be flooded
in addition to what is now flooded, if the dam were raised
two feet. There is now very little outside of the sloughs
and creek beds occupied by the pond. Raising the dam,
and making a larger pond, and deepening the water in it,
would tend to prevent ice on the pond. Deepening the race
a foot or two would prevent obstruction, to some extent, in
the race.

This testimony is undisputed and certainly reasonable.
The testimony clearly shows that the waste of water through
the plaintiff's dam and over it, and around the head of the

race and over its embankment, and in other ways, is very large,— one witness estimates it at one-half of the stream,— and that the dam is badly constructed, as well as being too low and uneven on the top, and that the race is badly obstructed by earth and stones, as well as by logs or timber, and that the dam and race and other means of creating the water-power are generally out of repair and insufficient, even with a three-foot dam and small pond. It is very clear that the plaintiff has been grossly negligent in the improvement and use of his water-power, and that with but little expense he could have raised his dam and tightened it, and lowered his races, and made all necessary improvements, that would have obviated the difficulty, and have prevented the injury and damages he complains of in this action.

In view of the above undisputed evidence, and the law as laid down by this court in the above cases, and even by the learned judge in his charge to the jury in this case, the plaintiff was not entitled to recover anything, even conceding all that the plaintiff claims as to the improper use of the stream by the defendant. In *Timm* v. *Bear*, *supra*, the plaintiff was not able to raise his dam at all without flooding the defendant's wheels. But here the plaintiff has no such excuse. All of the mills on this stream have been in operation for many years, and the defendants' mill and dam and other works have been nearly as now for over twenty years, and the defendants have evidently made the most profitable use they could of their power. The testimony is very uncertain and contradictory as to whether their works are disproportionate to the capacity of the stream, and are not made available in a manner the most reasonable. Their pond may be a large one on such a stream, but by that means, and their head of water, they vastly increase their power without much detention of the water. By running their mill in the day-time they draw down their pond a few

Coldwell, Adm'r, etc. vs. Sanderson and others.

inches, and, when the gates are shut, it fills up in two or three hours, and then the natural stream runs over their dam. But we do not wish to criticise the verdict of the jury, based upon the improper use of the stream by the defendants, because, on the whole evidence, and it being contradictory on that subject, it was a proper case for the jury.

I have stated the evidence in respect to the condition of the plaintiff's works as I think is warranted by all the testimony on that subject; and the testimony of both the expert witnesses, as to the feasibility of improving them so as to obviate the difficulty complained of, is in nearly their own language. The public are interested in having all such mills protected to the full extent of their rights, and in having them made as useful as they can reasonably be made in view of the expense thereof, and the fall and volume of the stream. The jury evidently disregarded the testimony of Prof. Conover and Capt. Nader as to the inadequate improvement of the water-power of the plaintiff, and his negligence in not avoiding, by reasonable means, the causes of his complaint, and they seem to have also disregarded the charge of the court in reference thereto.

It is the first and the vital question in the case whether the plaintiff was not himself at fault in causing the damages he complains of, by his own negligence; or, in the language of the opinion in *Miller v. Sherry, supra,* whether he has not " contributed largely to the injury complained of." The jury in that case found that the sheer-booms and dam of the plaintiff were insufficiently constructed, and that there was no practical difficulty in constructing them so as to avoid the grievance complained of against the owner of the upper dam, and this finding was held sufficient to defeat the plaintiff's action. So, in effect, should the jury have found in this case on the above undisputed evidence. It would be unjust for the plaintiff to complain of the defendants for making too great and too profitable a use of their water-

power by their well-constructed and expensive works, to his damage, when he is making too little use of his own power for want of its improvement; and its improvement at little expense would avoid such damage. The verdict of the jury was against the evidence, and should have been in favor of the defendants on this ground alone.

There are other exceptions; but they need not be considered, as on another trial they may be obviated.

We regret to find that the printed reply of the appellant's counsel to the respondent's brief is very discourteous and disrespectful to the learned counsel of the respondent, Mr. Chynoweth, in violation of a rule of this court. It charges him with having made wilful mis-statements in his brief and alludes to him as "Chynoweth" several times. We understand that the learned counsel of the appellants' claim that the brief in question was made by one of the appellants. But their names are appended thereto and they presented the same to the court. We must decline to receive it or to have it perpetuated upon the records of the court, and no expenses incurred thereby, must be taxed with the costs.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.

Upon a reargument granted December 14, 1886, on motion of respondent, counsel on both sides discussed the effect of the evidence, and the following opinions were filed June 1, 1887:

ORTON, J. Since the first argument and former decision of this case, the plaintiff, Nicholas Kirch, has died, and the present respondent has been appointed administrator of his estate. Re-argument was granted, upon the motion of the respondent's counsel, in order to review and reconsider the facts upon which the former decision was based, which it

was urged had been misconceived or not properly understood.

Upon again hearing the arguments and reading all the evidence upon the question, we are satisfied that the facts justified the legal conclusion that the plaintiff at least contributed to the injury of which he complained, by his own negligence in not having reasonably improved his own water power and privilege so as to obviate entirely, or in some measure, the damages he seeks to recover of the defendants. When the facts are given, the question of negligence is one of law. When the conditions of the stream and the character of the plaintiff's works are known, it is not a question of expert evidence, or of very high degree of skill, whether the works are reasonably sufficient to make the stream reasonably available for hydraulic purposes. When, as in this case, the complaint is that the defendants, either by the construction or unreasonable use of their works, detained or held back the waters of the stream from coming to the plaintiff's mill in sufficient volume or regularity, and thereby its profits are lessened, if the plaintiff's dam is too low or leaky to stop or hold the water, and his pond or reservoir too small to store it for regular and more continued use, and his head-race is too small, and too much filled up with earth, stone and brush, to make what water is stored in the pond the most available, and a large per cent. of the waters of the stream pass by, over, or through the embankments of the dam and race, without use, by reason of their insufficient construction or want of repair, one sensible man as well as another can say that his works are insufficient, and that he does not make as reasonably good and profitable use of the water that does in fact come down to him as he could or should. The legal conclusion from such facts is that the plaintiff contributes to his own injury or loss of profits by his own negligence, and the law says that in such case he cannot recover. The writer of the.

former opinion is perfectly satisfied with it, and is not dis-
posed to revise it, and the majority of the court, at least,
think the former decision correct.

But, inasmuch as it is complained that the facts are mis-
stated in that opinion, it is proper that the evidence bearing
upon the point decided be further considered, and more of
it specially cited.   After stating, in the former opinion, the
head of water and the size of the wheels of several mills
above, it is incidentally stated, in that connection, that the
plaintiff's mill " has a dam only three feet high," and it is
then described in the language of the expert witness Prof.
Conover, and the size of the wheels is stated to be eighty
inches, and the head to be eight feet.   The learned counsel
of the respondent challenges the correctness of this state-
ment of the height of the plaintiff's dam.   In doing so he
argues that it has a *fall* of about six feet.   It might be said
that the *height* of a dam is one thing, and the *head* or *fall*
produced by it is a very different thing.   The height can
easily be measured by a perpendicular rod, but the *head* and
*fall* are hydraulic questions of much more difficulty, and
depend upon many considerations of a scientific character.
But this difference is of little consequence.   And the real
height of the dam is of no particular consequence, and is
not stated in that opinion as being of any consequence.   Its
capacity to hold the water back so as to create a pond or
reservoir large enough for the storage of water of sufficient
depth and volume to create hydraulic pressure, and cause
steadiness and regularity of power, is the main thing.   The
only question in respect to its height that is of any im-
portance is, was it as high as it should have been?   There
was no evidence of any measurement of the height of the
dam, or of any estimate made of the fall or head afforded
by it.   The head at the flume or the mill at the lower end
of the head-race, eighty rods below, was stated in the evi-
dence to be about eight feet, and it is so stated in the opin-

ion. The real height of the dam may be approximated by considering all the evidence as to the surrounding facts, and I venture to assert that such facts will not only show that the plaintiff's dam was " only three feet high," but show even further that the plaintiff had scarcely any dam at all which answered the purpose of a dam.

Henry Kirch, the son of the plaintiff, testified substantially as follows: The upper end of the pond is only a quarter of a mile from the dam, and that was as far as the dam caused the water to flow back. After the water stops coming down, the pond will last only a couple of hours — in the summer time — to run one of the wheels at full gate. Above the present pond there is a wide flat which might be covered by the pond by raising the dam, and that would make the pond so much wider. The head-race near the mill is much wider,— may be twenty-five or thirty rods — and of the depth of the race in other places. As the water was drawn down the ice would break down, and, when the mill stopped, the water would fill the race on the top of the ice; and when it froze again, and the water was drawn down, the ice would break down again, and so, during the cold weather, the race would fill up with ice. *The ice in the pond would break down and fill up the same way and at the same time.* The water stood in the race just as it stood in the pond. On the morning of the 9th of January, after grinding the last part of the night, the witness went to breakfast, and came back in an hour, and the mill was running, and it ran about an hour, and drew the pond down about a foot. They then shut down, and waited a little while and started up again, and so they did all that day. " *The pond is not a big pond. It is a small pond.*" Between the 9th and 22d of January, 1884, the water sometimes ran over the dam. The mill was run half gates between those dates, and sometimes four or five hours in the day-time,— about one-third of a full run.

From this evidence it appears that the race is on the same level with the bottom of the pond, and the ice broke down in the same way and at the same time in both. The pond, if any, is a very small one. The dam was not very high. It could be exhausted in a very short time. Water came down every day between the dates in which damage is claimed to have been suffered, so that the mill could run at least one-third of the full time and power.

Prof. Conover testified substantially as follows: " The dam seems to be simply a large pile of stone. There is some timber worked into it, but very irregular. Some timber near the top; and on top of the timber, or near the top, there is a lot of boulders and stone. It is quite an uneven surface." The creek is very crooked, and skirted in some places with low ground forty or fifty rods wide. The dam flows the water back nearly a quarter of a mile only, and the water is raised some, over about ten acres. To raise the dam one foot the water would flow back only as far again as it does now, or about half a mile, or near the railroad bridge, and would not then cover the bogs in the river; and the present pond does not cover the bogs and high places between the sloughs, except in very high water. The fall of the creek from the bridge, one-half mile above the dam, to the dam, is only about two feet. The dam is two miles below the first mill above, which would make the entire fall in the creek which might be covered by a pond by raising the dam high enough about eight feet, and would require the present dam to be raised about six feet. The river is about forty or fifty feet wide, and about three feet deep on an average. There is an old race running from where an old dam stood, about a quarter of a mile above the present dam, extending down to the present dam. When the dam is full, there is a strong current running from that old race toward the dam, *and the water runs more from the head-race of plaintiff's mill towards the spill over*

*the dam than from the spill towards the head-race. The spill is not high enough to force the water into the race.* The plaintiff gets the most of his fall right at the mill. The head-race is about twenty feet wide on an average, and about three feet deep. The race is much filled up with mud, and there is considerable brush in it and along the sides, and roots growing into it, which obstruct the water to some extent. There is an arch over the upper end of the race, about ten feet wide and three feet deep, *on a level with the dam.* At one side of this arch, which is made of uncut stone, the large stones have fallen into the water, and there are other obstructions in it. (The first witness, Henry Kirch, testified that those stone had fallen in about two years before.) The waste over and through the dam is 588 cubic feet per minute in the stream below. The stream or streams run rapidly through the whole length of the pond. There is scarcely any connection between the water in the old race running through the pond and the other waters of the pond. There is much waste water over the embankment of the race and otherwise. Raising the dam one foot, and deepening the head-race one foot, would obviate the difficulty complained of by the plaintiff.

Prof. Conover was the only witness who surveyed and took levels and measurements of the stream at and above the dam, and the only one who knows the fall of the stream, and he testified that it is about four feet to the mile. The back flow from the dam is only one quarter of a mile up the stream at most. The dam only raises the water in the stream one foot, and hardly that. The dam, so far as it stops the water, does not exceed one foot in height. It does not raise the water high enough to cover the three-feet embankment of the old race running through it. There is no evidence in the case contradicting or affecting this testimony except to confirm it. The ice would naturally break down in the head-race and the pond alike, for they

are of about the same depth, according to the testimony of Henry Kirch, and "the pond was a very small one, and the dam not very high." Prof. Conover also testified that deepening the head-race, and making it wider, would give the plaintiff more power.

Capt. Nader testified substantially as follows: "There is very little land occupied by the pond outside of the sloughs and creek-bed; and, if the dam is raised only moderately, it would very slightly cover any more land, and would not hold much water. What constitutes the plaintiff's pond besides the bed of the creek is a small *basin* just above the dam of about two acres. It covers a very small area outside of the creek, sloughs, and depressions in that part of the valley." There is a waste in the creek below the dam of 270 cubic feet of water per minute. Take this evidence of Capt. Nader's alone, and the plaintiff has scarcely any pond or dam. He testified, further, that "if the plaintiff lowered his head-race a foot, and raised the dam at the same time, there would be an abundance of water. It would give freer access to the tail-race and to the mill." "Any amount that he would raise the dam would assist him in storing water if there was any water supply." "Raising the dam, and making a larger pond, and deepening the water in it, would tend to prevent obstructions from ice on the pond. Deepening the race a foot or two would tend to prevent obstructions, to some extent, in the race."

Any one knows this fact as well as Capt. Nader. If the plaintiff had a pond of the depth and size he ought to have for the purposes of a pond, the ice would not break down, and lie in the bottom, when the mill is only run a short time. It is true, Capt. Nader afterwards qualified, or attempted to qualify, these statements by the *proviso* that, if any water was allowed to come down. But the testimony of Henry Kirch was that water, to a certain extent, did come down every day, and that plaintiff ran his mill at in-

tervals during all the time he suffered the damage complained of, and so his *proviso* was fully answered. But we do not need the testimony of Capt. Nader or Prof. Conover, or any expert evidence, to establish the self-evident fact that the plaintiff's power could have been improved, at reasonable cost, so as to lessen greatly the damage he complains of at least, and probably to cure or obviate the difficulty entirely. The truth is that the plaintiff has never attempted to improve his power or mill privilege beyond taking the water from the bed of the stream, and conveying it a long distance down across a bend, until he reached a point where he could have a head or fall of eight feet. His dam was only intended to turn the water into the race, and some of the evidence shows that it did not do that even, but the water naturally ran into it from the bed of the stream. It is no new thing to build mills in this way. Along many rivers the water is taken from the bed of the stream, and carried by a race down to a point where sufficient head and power can be obtained. There the flume or bulk-head is established, and the water after passing the wheel is carried by a tail-race into the stream again, and in this manner this mill appears to have been built. If the plaintiff had such a pond or reservoir as he might and should have had to store up the water and hold it back against the time when it might be necessarily withheld by the upper mill-dam in order to fill it, can any one doubt that he could have run his mill many *more* hours between the 9th and 22d of January, 1884, than he did? He could have greatly lessened his damages by turning all the water into his race, instead of letting it pass by, and by clearing out his race, and in many other ways most reasonable. The plaintiff contributed to his own damage, in the times stated, by his negligence in not improving and making his power more available in many ways; and that is sufficient, by the authorities, to prevent his recovery.

It was said by Chief Justice DIXON in *Timm v. Bear*, 29 Wis. 254: "If, for example, the plaintiff's pond were as large, or capable, without too much expense and trouble, of being made as large, as that of the defendants, it is very improbable that any complaint of the kind here made would ever have been presented, or that the plaintiff would have suffered any injury from the detention or letting off of the water in the manner shown." And so here if the plaintiff had not built half as high a dam as the defendants. How can the damage he has caused to himself by his negligence be separated from that he charges upon the defendants?

But the learned counsel of the respondent does not question the law that the plaintiff cannot recover if he was negligent in not improving his power, if thereby he could have avoided the injury he has suffered, or any part of it, or if he contributed by such negligence to the damage he complains of, in the least. He insists that the plaintiff has a reasonably sufficient dam, of nearly six feet in height, and a reasonably large pond, and that his power is reasonably improved, and that he has not been guilty of negligence in any respect in these particulars. The evidence seems to be most pointedly and conclusively the other way. It would be monstrous to require an upper mill-owner to adapt his works, and the use of his power, to such grossly deficient works of improvement of a lower mill-owner. Any detention of the water by an upper mill-owner, with the best and most approved works and use of his power, in order to let his pond fill up, which would be lawful, as the learned judge before whom the case was tried charged the jury, would injure the owner of such a lower mill as that of the plaintiff as a matter of course. The lower mill has no pond, and the water is taken nearly from the bed of the stream. His power must therefore be very fluctuating and unsteady if the stream is interrupted at all. But he must not complain, except of himself, for neglecting to provide

by suitable works against such certain and reasonable contingencies. How can it be determined that the plaintiff was injured at all by the defendants' works or use of their power until he has made his own works, and improved his own power so as to make the waters of the stream which come down to him, during the time stated, reasonably available, considering the extreme cold of the season, and the ice which. would naturally form in the stream under any circumstances. It may be, and it is quite probable, that he would not have been injured by the defendants' mill, or the manner of its use, to any extent whatever, if he had improved his power to a reasonable extent, and made the best reasonable use of the stream,.as he should and could, and as it was his duty, and as any ordinarily prudent man would have done. This, most clearly, he has not done, and he cannot, therefore, recover.

From the character of the stream, and the ground skirting it on both sides between its natural embankments, it was the evidence, and it is apparent to any one, that the plaintiff could have increased the height of his dam so as to have made a pond at least six times larger than the present pond, or " *small basin* " as it is called by Capt. Nader, at very little cost. But far less dam and pond than that would have stored water enough for the plaintiff's constant use, winter or summer, with the use of the stream by the upper mill as it was during the days stated. The map of the stream made by Capt. Nader, and used as an exhibit in the case, is confirmatory of the above testimony in nearly all respects. That map shows scarcely any pond above the plaintiff's dam, and delineates the old race above as not connected, except at one or two points, with the other branches of the stream. The stream all along down to the dam is shown cut up into many curves, crooked currents, sinuosities, or branches, by intervening bogs and high land, and these places Capt. Nader called sloughs.

But I have sufficiently stated the evidence upon this point of the case. We all know how ice affects small streams in the winter; and as a cause, or contributing cause, of the detention or diminution of the waters of the stream, and as an element of damage to a water-power below with other causes, it is at best very uncertain. The testimony as to the character of the defendants' works, and the manner in which they were used at the times stated, has no particular bearing upon the question upon which the case was decided, any further than it may show the character of the plaintiff's works, and the manner of their use. It would seem, from the above evidence, that the proximate cause of the complaint was that the defendants run their mills by day, and shut down at night, to allow their dam to fill up. When it became filled, the water ran over, and passed down the stream as a matter of course. This would seem to show that the remote cause of the complaint must be that the defendant's dam is too high, and their pond too large, and therefore it took too long a time for it to fill up. But that is immaterial, and the verdict of the jury upon that point may be correct. But on the question of the plaintiff's contributory negligence the verdict is unquestionably wrong, and should have been set aside by the circuit court in accordance with its instructions to the jury. The evidence showing that the plaintiff contributed to the injury of which he complains, by his own negligence in not improving his own water power and privilege in a suitable and reasonable manner, so as to lessen, at least, if not completely avoid, the damages he claims to have suffered, is all one way, and not contradicted in any material respect. That the evidence is overwhelmingly preponderating against the verdict no sincere and unprejudiced mind can possibly question. I have quoted the evidence somewhat extensively, and said more upon the question because it has

been so persistently and vigorously urged that the former opinion was based upon a misconception of the evidence.

*By the Court.*— We adhere to the decision and the former opinion.

CASSODAY, J.   I favored the rehearing in this case because, after a very careful re-examination of the voluminous record, I became convinced that my acquiescence in the first decision was under a misapprehension as to portions of the evidence. That conviction has not been changed by any subsequent argument.   One of the defendants testified, and it is in effect admitted, that December 26, 1883, the main shaft in the defendants' merchant-mill broke, and the work of repairing it was not completed until January 8, 1884; that during that time they ran the custom-mill, but the water was allowed by them to run freely day and night; that January 8, 1884, they started the merchant-mill also, and from that time on would draw down their pond some every day, and then at night shut off the water to a quarter gate, when their pond would fill up, and then run over the dam.   The undisputed evidence also shows that the very coldest weather of the season was during the time the mill of the defendants was so disabled, ranging from the 3d to the 7th of January, inclusive, from zero down to twenty-seven degrees below.   There is evidence tending to show that Kirch had plenty of water at his mill, and no difficulty in running it, until January 9, 1884, which was after the coldest weather of the season had passed.   There is evidence tending to show that in consequence of the water being so shut off at the mill of the defendants on the night of January 8, 1884, and the running of the Kirch mill in the ordinary way during that night and the next day, the water was drawn down from under the ice in the race and pond of Kirch, and the river above, and consequently the ice broke down therein, so that, when the gates of the de-

fendants were again hoisted on the morning of January 9, 1884, the water ran upon the top of the ice, and spread out in different directions, not only at the Kirch race and pond, but along the whole river up as far as Loyd's mill, a short distance below that of the defendants; and then, by freezing on the night of the 9th, and subsequently, and the ice gorges which followed, the water of the river was mostly prevented from reaching the Kirch race or pond from the morning of January 10, 1884, to January 21, 1884.

By well-settled rules we have nothing to do with the weight or preponderance of the evidence, if there is enough to support the verdict. With great deference for the opinions filed, it seems to me that the question whether the defendants, in view of the extremely cold weather, reasonably used the water or manipulated their gates, and the question whether any insufficiency of the Kirch dam and race contributed to the want of water at his mill during the time mentioned, were each, under the evidence, questions of fact for the jury; and that, since there is no intervening error, their verdict, as to each of those questions, should be conclusive.

For these reasons I am forced to dissent.