JEFFERS, APPELLANT, *v.* MONTANA POWER CO. ET AL., RESPONDENTS.

(No. 5,015.)

(Submitted January 30, 1923.    Decided June 30, 1923.)

[217 Pac. 652.]

*Injunction — Nuisances — Waters and Watercourses — Storage Reservoirs — Complaint — Failure to Allege Negligence—Insufficiency—Costs.*

Nuisances—Waters and Watercourses—Storage Reservoirs—Failure to Allege Negligence—Insufficiency of Complaint.

1. *Held,* in an action to enjoin the maintenance and operation of a storage reservoir used for generating electric power, on the ground that it constituted a nuisance in that during the winter months when water was released for power development purposes an unnatural fluctuation of several feet in the level of the river below resulted causing the ice to break and jam and plaintiff's property to be flooded, that since the operation of the reservoir was authorized by law and under section 8645, Revised Codes of 1921, nothing done or maintained under express authority of statute can be deemed a nuisance, the complaint, in the absence of an allegation of negligence, did not state a cause of action.

Waters—Storage Reservoirs—Owners not Insurers.

2. Persons impounding waters for irrigation or power purposes are not insurers against damages caused thereby and are held only to the exercise of ordinary care in the construction and operation of their plants.

Taxing Costs—Refusal to Strike Item—When Proper.

3. Refusal to strike from defendant's memorandum of costs an item for the preparation of a topographical map used at the trial, as against the objection that the map had been prepared prior to the institution of the action and that at any rate no more than one-eighth of its cost could properly be charged against defendant, inasmuch as it had been made for use in seven other pending actions of like character, was proper, plaintiff's uncontradicted affidavits showing that it was made after institution of the action and for use in it alone.

Same—Conflict in Affidavits—Finding of Court Conclusive.

4. In case of a direct conflict in affidavits filed in support of and in opposition to a motion to tax costs with reference to an item claimed excessive by appellant, the finding of the district court is conclusive.

Same—Memorandum—Burden to Show Incorrectness upon Party Moving to Tax.

5. A memorandum of costs duly verified and filed makes out a *prima facie* case of the correctness of the items of disbursement contained in it, and the burden then devolves upon the party disputing their correctness to refute this *prima facie* showing.

[68 Mont. 114.]

Same—Witnesses not Testifying—Fees and Mileage—When Allowable.

6.  Where witnesses for the successful party were actually present at the trial and the testimony they were prepared to give was competent, relevant and material to the issues raised by the pleadings, the fact that they were prevented from testifying by the failure of the losing party to offer proof as to some of the issues raised was not a ground for striking their witness fees and mileage from the cost bill.

*Appeal from District Court, Madison County; Jos. C. Smith, Judge.*

ACTION by J. B. Jeffers against the Montana Power Company and others. Judgment for defendants and Susie L. Jeffers, substituted as party plaintiff for J. B. Jeffers, deceased, appeals. Affirmed.

*Mr. M. M. Duncan* and *Messrs. Pray, Callaway & Toole,* for Appellant, submitted a brief; *Mr. Duncan* argued the cause orally.

The action sounds in tort—for a nuisance. The earliest statute in Montana wherein nuisance is defined is found in section 228 of the Civil Practice Act of the territory of Montana of 1864. This statute was amended by section 249 of the Civil Practice Act of 1867 so as to read as follows: "Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, or unlawfully obstructs the free passage or use in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street or highway, is a nuisance." As such it is to be found in section 4550 of the Civil Code of 1895, in section 6162 of 1907 Codes, and in section 8624 of the 1921 Codes. Negligence is not mentioned anywhere in this definition, nor is it implied as an element of nuisance. The foregoing section has been construed in the following cases: *Chessman* v. *Hale,* 31 Mont. 577, 3 Ann. Cas. 1038, 68 L. R. A. 410, 79 Pac. 254; *Murray* v. *City of Butte,* 35 Mont. 161, 88 Pac. 789; *Empire Theater Co.* v. *Cloke,* 53 Mont. 183, L. R. A. 1917E, 383, 163 Pac. 107; *State ex rel. Ford* v. *Young et al.,*

54 Mont. 401, 170 Pac. 947; *Cavanaugh* v. *Corbin Copper Co.,* 55 Mont. 173, 174 Pac. 184; *Great Northern Ry. Co.* v. *Ennis,* 236 Fed. 17, 149 C. C. A. 227.

The maintenance of a nuisance gives rise to a single cause of action upon which a judgment for damages, and for an injunction abating the nuisance, may be awarded. The cause of action is single. (Rev. Codes 1921, sec. 9474; *Fitzpatrick* v. *Montgomery,* 20 Mont. 81, 50 Pac. 416; *Chessman* v. *Hale,* 31 Mont. 577, 3 Ann. Cas. 1038, 68 L. R. A. 410, 79 Pac. 254; *Wilhite* v. *Billings & Eastern Mont. Pr. Co.,* 39 Mont. 1, 101 Pac. 168; *Yolo* v. *Sacramento,* 36 Cal. 193; *Meek* v. *DeLatour,* 2 Cal. App. 261, 83 Pac. 300.) The sufficiency of the complaint was challenged on the ground that it did not state a cause of action by reason of the fact that the plaintiff did not allege that they had been guilty of negligence in manipulating the waters of the Madison River.

This objection was captious under the authorities. In the first place, the right of action springs from the violation of the venerable maxim, *"Sic utere tuo ut alienum non laedas."* (*Wilson* v. *New Bedford,* 108 Mass. 261, 11 Am. Rep. 352; *Ball* v. *Nye,* 99 Mass. 582, 97 Am. Dec. 56.) This maxim has been invoked by this court upon numerous occasions. (*Bullard* v. *Northern Pac. Ry. Co.,* 10 Mont. 68, 25 Pac. 120; *Longtin* v. *Persell,* 30 Mont. 306, 104 Am. St. Rep. 723, 2 Ann. Cas. 198, 65 L. R. A. 655, 76 Pac. 399; *Fordham* v. *Northern Pac. R. R. Co.,* 30 Mont. 421, 104 Am. St. Rep. 729, 66 L. R. A. 556, 76 Pac. 1040; *Quinlan* v. *Calvert,* 31 Mont. 115, 77 Pac. 428; *Watson* v. *Colusa-Parrot M. & S. Co.,* 31 Mont. 513, 79 Pac. 14; *Chessman* v. *Hale,* 31 Mont. 577, 3 Ann. Cas. 1038, 68 L. R. A. 410, 79 Pac. 254; *Driscoll* v. *Clark,* 32 Mont. 172, 80 Pac. 373; *Cavanaugh* v. *Corbin Copper Co.,* 55 Mont. 173, 174 Pac. 184.)

The rule is thus stated in 29 Cyc. 1155, title, "Nuisances": "The question of negligence is not involved in an action for the creation or maintenance of a nuisance and hence no negligence need be shown in order to establish defendants' liability

in damages or plaintiff's right to an injunction, nor can a
showing that there is no negligence defeat a recovery." (See
*Gavigan* v. *Atlantic Refining Co.,* 186 Pa. St. 604, 40 Atl. 834;
*Hay* v. *Cohoes Co.,* 2 N. Y. 159, 51 Am. Dec. 279; *Schnitzer* v.
*Excelsior Powder Mfg. Co.* (Mo. App.), 160 S. W. 282; *Boston
Ferrule Co.* v. *Hills,* 159 Mass. 147, 20 L. R. A. 844, 34 N. E.
85; *Southern Ry. Co.* v. *Robertson,* 16 Ala. App. 151, 75 South.
831; *Millett* v. *Minnesota Crushed Stone Co.,* 145 Minn. 475,
177 N. W. 641; *T. A. Snyder Preserve Co.* v. *Beemon* (Ky.),
60 S. W. 849; *Exley* v. *Southern Cotton Oil Co.,* 151 Fed. 101;
*State* v. *City of Portland,* 74 Me. 268, 43 Am. Rep. 586.)
While there are exceptions to this general rule they are such
only as have been declared by statute. But the statutory
authority which will justify an injury to private property and
afford immunity for acts which otherwise would be a nuisance
must be express or must be a clear and unquestionable implica-
tion from powers expressly conferred, and it must appear that
the legislature contemplated the doing of the very act which
occasioned the injury. (*Cogswell* v. *New York, N. H. & H. R.
Co.,* 103 N. Y. 10, 57 Am. Rep. 701, 8 N. E. 537; *Baltimore &
P. R. Co.* v. *Fifth Baptist Church,* 108 U. S. 317, 28 L. Ed.
739, 2 Sup. Ct. Rep. 719 [see, also, Rose's U. S. Notes]; *Hill*
v. *Metropolitan Asylum Dist.,* L. R. 4 Q. B. 433, L. R. 6 App.
Cas. 193; *Pottstown Gas Co.* v. *Murphy,* 29 Pa. St. 257; *Eames*
v. *New England Worsted Co.,* 11 Met. (Mass.) 570; *Common-
wealth* v. *Kidder,* 107 Mass. 188; *Townsend* v. *Norfolk R. & L.
Co.,* 105 Va. 22, 115 Am. St. Rep. 842, 8 Ann. Cas. 558, 4
L. R. A. (n. s.) 87, 52 S. E. 920; *Root* v. *Butte A. & Pac.
Ry. Co.,* 20 Mont. 345, 51 Pac. 155.)

If negligence may ever be deemed necessary to be considered
in this case it should go only to measure the extent of the
decree and other than this it has no materiality. Thus, if it
should be shown by the defendants that the acts in injuring
the plaintiff arose out of the negligent conduct of defendants'
lawful business and that if in the future the defendant might
operate its business in a careful manner so as not to injure the

plaintiff, then the decree should not abolish the defendant's business but should merely restrain them from operating it in such manner as would harm the plaintiff. (*Schaub* v. *Perkinson Constr. Co.*, 94 Tenn. 222, 28 S. W. 1094; *Wilhite* v. *Billings & Eastern Mont. Pr. Co.*, 39 Mont. 1, 101 Pac. 168.)

The alternate obstruction and release in large volumes of the waters of the Madison River by the defendants during freezing weather resulting in current fluctuations and the formation of shore ice which broke up and together with slush ice formed ice jams to the injury and damage of the plaintiff, entitled the plaintiff to a judgment for damages and the threatened continuance of the same entitled the plaintiff to an injunction. One who wrongfully places an obstruction in a natural watercourse thereby diverting the flow upon the lands of another, creates a nuisance *per se.* (*Chessman* v. *Hale,* 31 Mont. 577, 3 Ann. Cas. 1038, 68 L. R. A. 410, 79 Pac. 254; *Allen* v. *Stowell,* 145 Cal. 666, 79 Pac. 371; 29 Cyc. 1178.) The flooding of private lands is a taking within the constitutional prohibition. (*Fitzpatrick* v. *Montgomery,* 20 Mont. 181, 63 Am. St. Rep. 622, 50 Pac. 416; *Pumpelly* v. *Green Bay & M. Canal Co.,* 13 Wall. (U. S.) 166, 20 L. Ed. 557 [see, also, Rose's U. S. Notes]; *Staton* v. *Norfolk & C. C. R. Co.,* 111 N. C. 278, 16 S. E. 181; *Wine* v. *Northern Pac. Ry. Co.,* 48 Mont. 200, Ann. Cas. 1915D, 1102, 49 L. R. A. (n. s.) 711, 136 Pac. 387; *Michigan Paper Co.* v. *Kalamazoo Valley Electric Co.,* 141 Mich. 48, 104 N. W. 387; *Hendrick* v. *St. Joseph,* 138 Mo. App. 396, 122 S. W. 375; 40 Cyc. 577, 583, 591.) It is the duty of one obstructing a natural watercourse to anticipate the probable action of the elements upon the stream. So it has been held that it is the duty of a person diverting or obstructing the natural course of the stream not only to provide for normal rainfall but for such floods and freshets which may occasionally occur, whether they are called ordinary or extraordinary. The courts are in practical unanimity upon this proposition. In England the foremost case is the recent one of *Greenock Corporation* v. *Caledonia Ry. Co.,* Ann. Cas.

1918A, 1103, which was decided in the house of lords in 1917.
And see the following opinions from the courts of this country:
*Southern R. Co.* v. *Plott*, 131 Ala. 312, 31 South. 33; *Arizona
Eastern R. Co.* v. *Moore*, 18 Ariz. 528, 163 Pac. 607; *St. Louis
etc. R. R. Co.* v. *Mackey*, 95 Ark. 297, 129 S. W. 78; *Rogers* v.
*Oregon-Wash. R. R. & Nav. Co.*, 28 Idaho, 609, 156 Pac. 98;
*Illinois Cent. R. R. Co.* v. *Heiser*, 45 Ill. App. 143; *Evansville
etc. R. R. Co.* v. *Scott*, 67 Ind. App. 121, 114 N. E. 649;
*Thompson* v. *Illinois Cent. R. R. Co.*, 177 Iowa, 328, 158 N. W.
676; *Riddle* v. *Chicago etc. R. Co.*, 88 Kan. 248, 128 Pac. 195;
*Madisonville etc. R. R. Co.* v. *Renfro* (Ky.), 127 S. W. 975;
*Howe* v. *Ashland Lumber Co.*, 110 Me. 14, 85 Atl. 160; *South
Side Realty Co.* v. *St. Louis etc. R. R. Co.*, 154 Mo. App. 364,
134 S. W. 1034; *Fairbury Brick Co.* v. *Chicago etc. R. R. Co.*,
79 Neb. 854, 13 L. R. A. (n. s.) 542, 113 N. W. 535; Pahlka
v. *Chicago etc. R. R. Co.*, 62 Okl. 223, 161 Pac. 544; *Price* v.
*Oregon R. R. Co.*, 47 Or. 350, 83 Pac. 843.

Injunction is a matter of right. It is established by the
weight of authority that where the existence of a nuisance is
clearly shown together with the fact that it is causing another
material, substantial and irreparable injury for which there
is no adequate remedy at law, the injured person is primarily
entitled as a matter of right to the issuance of an injunction
enjoining or abating the nuisance without reference to the
comparative benefits conferred thereby, or the comparative in-
juries resulting therefrom; and in such cases the issuance of
the injunction is not discretionary with the court. (*McCleery*
v. *Highland Boy Gold Mining Co.*, 140 Fed. 951; *American
Smelting & Refining Co.* v. *Godfrey*, 158 Fed. 225, 14 Ann.
Cas. 8, 89 C. C. A. 139; *Arizona Copper Co.* v. *Gillespie*, 12
Ariz. 190, 100 Pac. 465; *Weimer* v. *Lowery*, 11 Cal. 104;
*Wente* v. *Commonwealth Fuel Co.*, 232 Ill. 526, 83 N. E. 1049;
*Holsman* v. *Boiling Spring Bleaching Co.*, 14 N. J. Eq. 335;
*Pennsylvania Lead Co.'s Appeal*, 96 Pa. St. 116, 42 Am. Rep.
534; *State ex rel. Hopkins* v. *Excelsior Powder Mfg. Co.*, 259
Mo. 254, 169 S. W. 267; *Hard* v. *Blue Points Co.*, 170 App.

Div. 524, 156 N. Y. Supp. 465; *Bourne* v. *Blue Points Co.,* 169 App. Div. 626, 155 N. Y. Supp. 466.)

*Mr. L. O. Evans, Mr. W. B. Rodgers, Mr. D. M. Kelly, Mr. John V. Dwyer* and *Mr. George R. Allen,* for Respondents, submitted a brief; *Mr. Evans* argued the cause orally.

Negligence is the gist of the action, and it must be pleaded and proved. Every right of action in favor of one person and against another must arise out of some legal duty of the other to the one which, by act or omission, he has failed to perform. The operation of the Hebgen reservoir and the transportation of the waters through the channels of the Madison River for a useful purpose is a lawful business. The right to the use of the waters of this state and to impound flood, seepage and waste waters in reservoirs is done under express authority of statute. (Sec. 7093, Rev. Codes, 1921.) The use of the channel of a stream is also given by express authority of the statute. (Sec. 7096.) The right to sell surplus water, so stored, is likewise a statutory right. (Sec. 7113.)

The appellant bases his right to recover upon the theory that this is a nuisance action. Section 8645 provides: "Nothing which is done or maintained, under the express authority of a statute can be deemed a nuisance." It is neither charged nor attempted to be proven that the construction and operation of this property was not done in accordance with the statutes. "Nothing which is legal in its erection can be a nuisance *per se,* nor can any lawful business be spoken of as a nuisance *per se.*" (29 Cyc. 1159, sec. 6.)

The cases of *Fleming* v. *Lockwood,* 36 Mont. 384, 122 Am. St. Rep. 375, 13 Ann. Cas. 263; *Hopkins* v. *Butte etc. Co.,* 13 Mont. 223, 40 Am. St. Rep. 438, 33 Pac. 817; *King* v. *Miles City I. Co.,* 16 Mont. 46, 50 Am. St. Rep. 506, 41 Pac. 431; *Billings Realty Co.* v. *Big Ditch Co.,* 43 Mont. 251, 115 Pac. 828, and the authorities generally, make negligence the gist of the action in cases of this kind. (See *Brooks* v. *Cedar Brook Co.,* 82 Me. 17, 17 Am. St. Rep. 459, 7 L. R. A. 460, 19 Atl.

87; *Livingston* v. *Adams & Rider,* 8 Cow. (N. Y.) 175; *Duns-bach* v. *Hollister,* 49 Hun, 352, 2 N. Y. Supp. 94; *M'Nulty* v. *Ludwig & Co.,* 153 App. Div. 306, 138 N. Y. Supp. 84; *Everett* v. *Hydraulic Flume Tunnel Co.,* 23 Cal. 225; *Campbell* v. *Bear River & Auburn Water & Mining Co.,* 35 Cal. 679; *Murphy* v. *Gillum,* 73 Mo. App. 487; *Greeley Irrigating Co.* v. *House,* 14 Colo. 549, 24 Pac. 329; *Sutliff* v. *Sweetwater Water Co.,* 182 Cal. 34, 186 Pac. 766; *Anderson* v. *Rucker Bros.,* 107 Wash. 595, 8 A. L. R. 544, 183 Pac. 70; *Maplewood Farm Co.* v. *City of Seattle,* 88 Wash. 634, 153 Pac. 1061; *Sherwood* v. *St. Louis S. W. Ry. Co.* (Mo. App.), 187 S. W. 260; *Inhabitants of Durham* v. *Lisbon Falls Fibre Co.,* 100 Me. 238, 61 Atl. 177; *Alabama Consolidated Coal & Iron Co.* v. *Turner,* 145 Ala. 639, 117 Am. St. Rep. 61, 39 South. 603; *Field* v. *Apple River Log-Driving Co.,* 67 Wis. 569, 31 N. W. 17; *Moore* v. *San Vicente Lumber Co.,* 175 Cal. 212, 165 Pac. 687.)

The injury, if appellant did suffer any injury more than he normally would have suffered, was caused by the choking up of the river channel, and the consequent diversion of the water by an ice-gorge, the formation of which was not due in any manner to the operation of the Hebgen reservoir, but was due to a long period of protracted cold weather. The damage was therefore not direct but consequential. There is no causal connection between the act of operating the Hebgen reservoir and using the channel of the Madison River for the conveying of water, as was done in this case, and the flooding of appellant's land. To entitle the appellant to recover he must show that the respondents herein were guilty of negligence, which proximately caused the injuries complained of. The burden of showing this negligence, and of showing that it proximately caused the injury complained of, was upon the appellant, and he did not sustain it. (*Montgomery Light & Waterpower Co.* v. *Charles,* 258 Fed. 723; 3 Kinney on Irrigation, 2d ed., sec. 1693.)

The numerous cases cited by appellant in support of his contention that negligence is not an element of this case are either cases of direct trespass or cases where the thing complained of, as in the case of *Ball* v. *Nye,* 99 Mass. 582, 97 Am. Dec. 56, cited by appellant, is a nuisance *per se.*

Appellant in his brief, after discussion and numerous cases cited as supporting his contention says: ''As the evidence in the case shows, everybody knew the habit of the river to gorge, and under the foregoing authorities, when the defendants released quantities of water thereby suddenly increasing the flow of the river greatly above normal, the defendants should have anticipated the damage it was likely to do, and because they did not anticipate it and forfend against it they are liable in this action.'' This is the rule which the respondents rely on. If the appellant desired to make the respondents pay damages under this rule, it was necessary for him to have pleaded the fact that this was the habit of the river, that it was known to the respondents or, in the exercise of reasonable care, should have been known, and that notwithstanding such knowledge, the respondents negligently failed to anticipate such gorging, and negligently turned out the water, knowing of the existence of the gorge, or, being bound to anticipate the existence of the gorge, thereby caused the injury. After pleading such, the appellant would have been bound to prove it; likewise, if this had been pleaded, the respondents would have been notified that on that theory they were expected to be held, and such notification by the complaint would have given them an opportunity to have prepared their defense on that issue.

HONORABLE A. J. HORSKY, District Judge, sitting in place of MR. CHIEF JUSTICE CALLAWAY, disqualified, delivered the opinion of the court.

Since the trial of this action in the district court, the plaintiff, J. B. Jeffers, has died, and Susie L. Jeffers, his wife, as executrix of the last will and testament of J. B. Jeffers, de-

[68 Mont. 114.]

ceased, has been substituted as party plaintiff in his stead. Appeal from a judgment following a directed verdict in favor of the defendants. This is an action for damages to plaintiff's property and for equitable relief by way of injunction to permanently restrain the defendants and their servants, *etc.*, from maintaining and operating a certain dam known as the Hebgen dam in the manner set forth in the complaint.

In his second amended complaint, plaintiff alleges that he was the owner of certain lands in the Madison Valley, together with buildings thereon, which he had occupied for several years as his home; that the lands were valuable for raising agricultural crops and livestock and were so used by the plaintiff during his occupancy thereof; that there is situated upon the Madison River, in Gallatin county, Montana, what is known as the Hebgen dam, constructed across and in said Madison River for the purpose of damming up and storing large quantities of water; that the defendant, Montana Power Company, which for convenience will hereinafter be designated as the Power Company, is the owner of power dams situated on the Madison and Missouri Rivers, together with certain hydroelectric generating plants, which it operates by means of the power furnished by the water stored in the dams; that a certain corporation known as the Montana Reservoir & Irrigation Company, hereinafter called the Reservoir Company, was a subsidiary corporation of the Power Company and that the record title to said Hebgen dam and reservoir is in the name of the Reservoir Company. The complaint then gives the total capitalization of the Reservoir Company and alleges that the Power Company owns all of the capital stock of the Reservoir Company with the exception of five shares, which stand in the name of its five directors, each of whom has one share for the purpose of qualifying him as a director of the Reservoir Company; that at all times the Power Company has dominated, controlled and directed the policy, operation and management of the Hebgen dam; and that at all times the defendant Frank M. Kerr has been vice-president and general

manager of the Power Company and likewise general manager of the Reservoir Company. It is further alleged that the Hebgen dam and reservoir were constructed, maintained and used by the Power Company, through its subsidiary, the Reservoir Company, for storing water for generating power and releasing the water when the Power Company desires to manufacture power in excess of what can be furnished by the natural flow of the Madison and Missouri Rivers; that the defendant Kerr in his capacity as general manager of both companies has charge and control over the operation and method of operation of the Hebgen dam and the manipulation of the waters of the Madison River flowing through and out of the Hebgen dam; that the defendant Dawson was employed by the Power Company as superintendent and managing agent of the company at the Hebgen dam under the supervisory direction and control of Kerr; that Dawson had immediate physical control of the manipulation of the flow of the river passing through the dam; and that the defendants were acting in concert and engaged in carrying out the plan and operation of the dam devised by the defendant company.

It is then alleged that the lands of the plaintiff are situated upon a low bottom bordering upon the east bank of the Madison River downstream from said Hebgen dam and so lying that when the waters of the river overflow the east bank they naturally flow upon plaintiff's land; that "during the months of January, February and March, 1917, the natural flow of said water in said Madison River was at, or slightly below, normal; that during said months there were periods of freezing weather, during which periods there was a rapid and constant formation of ice in said Madison River; that during said months water was released from said Hebgen dam by defendants, as is hereinafter mentioned, for power purposes only, and the same was used by the defendant, the Montana Power Company, in the operation of its power plants; and the defendant Power Company directed the release thereof that it might use the said waters for the purpose of generating hydroelectrical

power, and the waters of the said Hebgen dam were released only upon the orders and at the direction of the defendant, the Montana Power Company, through its general manager, the defendant Kerr, and not otherwise; that the said defendant Kerr, and by his orders the defendant Dawson, operated said Hebgen dam and said power dams during said months and particularly during said periods of freezing weather, in such manner as to discharge at various times, in said river, large quantities of water, thereby greatly and suddenly increasing the flow of said river over the natural flow thereof, and causing unnatural fluctuations in the flow of said river, and as a consequence thereof shore ice formed in said river high upon the banks thereof, and the same became broken up and, together with slush ice which was then flowing in said river, were caused to form 'jams' or ice dams in said river; that the storage of water by the Hebgen dam, as aforesaid, was so affected, regulated and controlled by said defendants Kerr and Dawson that sometimes, and within the time hereinbefore specified, the flowage of the water in said river below said dam would be greatly increased above the normal flow of said river, as aforesaid, and through such a practice the ice bodies formed during the winter months in freezing weather, as aforesaid, were largely in excess of such as would have been formed if the said river had during such time been permitted to flow at its normal natural state, and at such times when great quantities of water were released from said dam into said river, as aforesaid, ice bodies were formed in many places along the channel thereof and near the lands of plaintiff hereinabove described, and when the said flow of said river was increased, as aforesaid, the channel of said river at such places was rendered incapable of carrying water and ice flowing down said river, and jams and ice dams were formed in said river as aforesaid; that, by reason of the foregoing, the waters flowing in said river were forced out of the natural channel thereof, and under the soil, along and away from the banks thereof and overflowed the banks of said river and said waters flowed

through, over and upon the lands of plaintiff hereinabove described, greatly damaging the same and injuring and destroying the plaintiff's personal property thereupon.'' The complaint then describes in detail the damages sustained by the plaintiff.

It is further alleged that this condition was proximately caused by the operation of the dam by the defendants in the manner alleged and would not have occurred but for such operation of the dam; that if the waters of the Madison River are permitted to flow in the channel thereof in their natural course and way, and without interference upon the part of the defendants, the plaintiff in the future will not be subjected to such injury and damage and will be able to enjoy his lands and the possession and use thereof without disturbance or molestation or injury, as he did prior to the construction of the dam; that if defendants are permitted to continue their course of operation it will result in plaintiff's land being flooded and damaged from time to time; that the dam is maintained by the Power Company solely for storage purposes and during the winter-time for the purpose of generating power and for no other purpose, and that if it is used at all for such purposes during the winter-time it must be for power purposes, and the release of large quantities of water during and in freezing weather when large quantities of power are needed in the company's business, so that if defendants are permitted to operate the dam in the winter. months the plaintiff's property will continue to be damaged, and that the operation of the dam when so operated is a nuisance; that adequate relief in damages cannot be obtained by the plaintiff, and that unless defendants are restrained a multiplicity of suits for damages by plaintiff will become necessary, and that plaintiff will be deprived of his property without due process of law and without compensation first being paid, as required by the national and state Constitutions.

In his prayer the plaintiff asks that an order to show cause be issued directing the defendants to appear and show cause

why the defendants and its and their servants, *etc.,* should not be restrained and enjoined during the pendency of the suit from maintaining and operating said dam as above set forth, and enjoining and restraining the defendants from interfering with the natural flow of the Madison River; that upon final hearing of the cause said Hebgen dam be declared a nuisance and said injunction be made permanent, and that plaintiff have judgment against defendants for the sum of $18,750 damages and for his costs.

The defendants demurred to the second amended complaint on the ground that it failed to state a cause of action and that there is a defect in parties disclosed in said complaint, in that it appears therefrom that the Reservoir Company is a necessary and also a proper party to be joined as the defendant in said suit. This demurrer was overruled, and the defendants filed a joint answer, in which they admit the incorporation of the Reservoir Company and allege that it had title to and is now the owner of the Hebgen dam and reservoir; that the total capitalization of the reservoir Company was and is 50,000 shares of the par value of $100 each, of which 14,259 shares are issued and outstanding; that the company has five directors, and that the Power Company owns 14,250 shares of the stock. It is admitted that the defendant Kerr is vice-president of the Power Company and its general manager in Montana, and also the general manager of the Reservoir Company. The defendants deny all of the allegations of damage alleged to have been sustained by the plaintiff. It is admitted that during the months of January, February and March, 1917, the natural flow of the Madison River was at or slightly below normal, and that during those times there were periods of freezing weather and constant formation of ice in the river. It is further admitted that during these months certain quantities of water which had been stored in the dam were at certain periods released and permitted to flow down the river; that shore ice formed in the river and at times was broken up and, together with slush ice, formed at certain periods and

places jams or ice dams in the river. Defendants deny that the jams or ice dams were caused by releasing the water from the dam and deny that the flooding or gorging or damming in or from the river or upon any of the plaintiff's lands was caused by the release of any of the waters from the Hebgen dam or by the defendants. It may be stated generally that with the exception of the admissions above mentioned the defendants' answer is a general denial of plaintiff's complaint.

For a further and separate defense defendants allege the incorporation of the Power Company under the laws of New Jersey and aver that it was and is engaged in operating power dams and generating plants in Montana for the purpose of generating electrical power, and that at all times since prior to the year 1916 has been conducting a public utility business in the state of Montana, and as such has been subject to the jurisdiction of the Railroad and Public Service Commission of the state of Montana; that the Reservoir Company is a Montana corporation engaged in the business of generating power and storing water for irrigation, for sale to power generating plants, and other useful purposes, and is now, and at all times mentioned in the answer has been, conducting a public utility business in this state, and as such has been and now is subject to the jurisdiction of the Railroad and Public Service Commission of the state of Montana; that during the year 1906 all of the waters of the Madison River were appropriated under the laws of the state of Montana at the point where the Hebgen dam is situated, for the purpose of irrigation and generating hydroelectrical current and power, and for other useful purposes; that the storage of water was begun in 1912 and that certain of the waters so appropriated and stored have been sold to the Power Company and others, and have at various times, when needed, been released from Hebgen dam by the Reservoir Company and permitted to flow down the Madison and Missouri Rivers and used at points below for irrigating and the generation of power and other useful purposes; that the amount of water so released and added to the amount

of water flowing in the river has never at any time been equal to the quantities which naturally flow or would flow in the river naturally in the times of high water each year, and that the amount of water released, together with that flowing in the river, has not been sufficient to overflow the natural banks of the river, and that during the entire period from the first day of October, 1916, to and including the month of March, 1917, the weather along the Madison River was unprecedently severe, and during that period there were continuous periods of freezing, and that the flooding or injury to plaintiff's lands was caused by such extraordinary, unexpected and unprecedented conditions of weather or the act of God.

For another and further and partial defense to the cause or causes of action attempted to be set up in plaintiff's second amended complaint, and as a defense to so much of said second amended complaint as seeks injunctive relief, defendants allege the incorporation of the Power Company and the Reservoir Company; that both are public utilities subject to the jurisdiction of the Public Service Commission of the state of Montana; that the Power Company is, and at all times since the latter part of 1912 has been, the owner of and maintaining large hydroelectric plants, consisting of dams, flumes, plants and generating plants along the Madison and Missouri Rivers; that the Great Falls Power Company was also a Montana corporation, engaged in maintaining and operating hydroelectric plants and subject to the jurisdiction of the Public Service Commission, and has a number of plants; that the power and current produced from all of the plants owned and operated by the Power Company and the Great Falls Company supply large numbers of cities and towns in Montana, which are set out in the complaint, and also many large industries, which are also mentioned; that the Hebgen dam and reservoir were constructed during the years 1909 and 1915, inclusive, at a cost of more than $1,000,000 and the capacity of the reservoir is sufficient to add 1,000 second-feet to the natural flow of the Madison River for 154 days, or the equivalent thereof; that

the dam and reservoir since their construction have been used for the purpose of storing the waters of Madison River and releasing the same during periods of low water in the Madison and Missouri Rivers, for the purpose of using the same for irrigation and selling the right to use the same to the Power Company to increase the flow of the river for generating electrical power during periods of low water at each of the plants of the Power Company; and that during high water the waters of the Madison and Missouri are sufficient to operate the plants, but during low water they are not, and that the waters released from the Hebgen dam have added to the capacity of the plants approximately 40,000 electrical horse-power.

It is alleged upon information and belief that there is no site on the river, or adjacent or close enough thereto to be practical, where a further plant could be constructed and operated at a cost which would not be prohibitive at the rates fixed or obtainable for electrical current and energy, in communities and districts above described, to take the place of the power obtained from the waters stored in the Hebgen dam; that the communities and industries specified in the complaint have no other source of obtaining power or energy to supplant that furnished by the defendant company and the Great Falls Power Company, and that the communities and their inhabitants and industries are dependent upon said power for their uses; that the Hebgen dam and reservoir are assessed for the purpose of taxation under the laws of this state in excess of $1,000,000, and the plants of the Power Company and the Great Falls Power Company, dependent directly upon the use of the waters stored in the Hebgen reservoir, are assessed at approximately $3,500,000, and the taxes annually paid upon these dams and the portion of the hydroelectric plant dependent upon such stored waters to the county and state governments of Montana are the sum of $43,200; that if the maintenance and use of the dam be enjoined and restrained the value of the same would be destroyed and the state and county governments of Montana will be deprived of taxes

approximating the sum of $55,000, and a depreciation in the value of the plants of the Power Company and the Great Falls Power Company as a result thereof would approximate the sum of $5,000,000, the companies would be deprived of more than 40,000 electrical horse-power, the communities and the industries described in the answer would be deprived of electrical current and energy, and the damage and injury which would be caused to the power companies and the communities and industries would be immeasurably greater than any possible damage which would be caused to the plaintiff by the continuance of the use of the waters stored in the Hebgen dam.

For a third separate defense it is alleged that there is a defect of parties defendant in that the Reservoir Company is a necessary party defendant. In the remaining separate defenses denominated "fourth," "fifth," "sixth," "seventh" and "eighth," defendants allege that plaintiff's cause of action is barred by certain statutes of limitation.

To this answer the plaintiff interposed a reply which in effect denies all of the affirmative allegations of defendants' answer.

The cause was tried to the court sitting with a jury.

The disposition to be made of this case renders unnecessary a detailed examination of the evidence. So much of the testimony as is necessary or desirable to call attention to is as follows:

Some time in May, 1906, one J. L. Templeman appropriated and located 240,000 inches of the flood, waste, surplus and unappropriated waters of the Madison River in Gallatin county, Montana. The purposes of the appropriation of the water as disclosed by the notice of appropriation are mainly for collecting, preserving, impounding and storing the same in the reservoir, which is the site of the present Hebgen reservoir, and for the transportation of certain waters to and upon lands situated in Madison, Gallatin, Broadwater, Lewis and Clark and other counties in Montana; and also for the generation of electric power and other useful purposes; the notice further specified

that the waters will be conveyed to the places of intended use "by means of the natural channels of the Madison, Jefferson and Missouri Rivers."

These water rights were acquired by the Reservoir Company, which was organized in August, 1906. The construction of the Hebgen reservoir began in September, 1907, and was completed in 1915 or 1916. The defendant, the Montana Power Company, was organized on December 12, 1912, more than six years after the organization of the Reservoir Company.

After the completion of the Hebgen reservoir, the Reservoir Company engaged in the irrigation of lands in the Helena and Prickly Pear Valleys, and still continues to irrigate such lands to the extent of about 8,500 acres. In 1916 the Reservoir Company also entered into a contract with the Montana Power Company to deliver to the company for use at certain of its hydroelectric power plants located on the Madison and Missouri Rivers, the flood waters so stored in the Hebgen reservoir, the contract price being $140,000 a year for the first two years, and thereafter $108,000 per year. The delivery of water to the Power Company began some time in 1916. The Power Company was never given any proprietary right in the water; it simply had the right to use it through its wheels under the agreement between the companies, that is to say, the Reservoir Company never sold the water to the Power Company, only the right to use it, as it passes through its plants and undertook to deliver this water to the Power Company at its plants, so that the Power Company had no control over the waters of the Hebgen reservoir until they reached the reservoir of the Montana Power Company.

The defendant Frank M. Kerr has been vice-president and general manager of the Power Company since September, 1914, and president and general manager of the Reservoir Company since May, 1914. The defendant Joseph C. L. Dawson was the custodian or man in charge of the Hebgen reservoir for the Reservoir Company during the time complained of.

The operation of the reservoir by the Reservoir Company, consists of storing water of the Madison River in the spring and summer, and the water is released at the request of its customers for the Prickly Pear irrigation districts, near Helena, and the Power Company. The irrigation district requires water during May, June, July, August, September and occasionally October, of each year, and during the months of October, November, December, January, February, March and April the water stored in the Hebgen dam is delivered by the Reservoir Company to the Power Company, at the request of the latter, from time to time for the purpose of generating electric power in the Madison and Missouri Rivers.

The water is released from the Hebgen Reservoir by means of stop logs, eight feet long and twelve inches square, which are removed and replaced by the use of an electric crane. It was admitted by counsel for the respective parties that when four logs, one from each of the four compartments in the dam through which water is released, are taken out at the top of the headgate, it releases twelve inches of water in height. Whenever the natural flow of the water in the river was insufficient to generate the power required at the various plants of the Power Company located along the Madison and Missouri Rivers, this fact would be communicated by employees of the Power Company to the custodian or man in charge of the Hebgen reservoir, and stop logs would be removed and the natural flow of the water thereby increased in such an amount as was necessary to supply the demands of the Power Company. If more water was being released than was necessary, the stop logs necessary to cut down the supply were replaced, which decreased the amount of the water flowing in the river below the dam.

Several witnesses who own and occupy land below the site of the reservoir, and bordering on or in the vicinity of the Madison River, testified that during the months of January, February and March of 1917 the water in the Madison River would rise and recede an appreciable amount every five or

six days. These fluctuations in the waters of the river were caused by the taking out or replacement of stop logs in the Hebgen dam. It was also testified that the fluctuations could have been caused by the slowing up of the river due to the formation of ice in the stream.

At the times of high water in the Madison and Missouri Rivers, there is sufficient water to operate all of the hydro-electric plants of the defendant company to their full capacity, but there is not sufficient water in the winter-time without the supply from the Hebgen reservoir, and it was due to this fact that during the months of January, February and March of 1917 water was being released from the Hebgen reservoir upon requisitions from the Power Company.

As far back as the witnesses could remember ice-gorges have formed in the Madison River, more or less every winter, and during winters having long periods of cold weather, as in the winter of 1917, the ice-gorges extended over large areas of the Madison Valley and likewise over portions of the land of the plaintiff, the extent of the ice-gorge being measured by the temperature and by the duration of cold periods. The testimony is to the effect that the ice-forming factors on the Madison River in the winter of 1917 were more extensive than in any winter for a period of about twenty-one years.

During the months in question the rise and fall of the water in the river varied according to the testimony of the several witnesses from a few inches to a foot and a half, but it is undisputed that during that period the amount of water released from the Hebgen reservoir, when added to the natural flow in the river, would not at any time exceed safe carrying capacity of the channel during the summer floods; in other words, the water has always been controlled within the natural limits of the stream and within the limits of its ordinary high and low water marks.

The plaintiff's lands are located several miles below the site of the Hebgen dam, and a portion thereof that borders on the river, spoken of in the testimony as lowlands, has been flooded

nearly every winter as far back as witnesses could remember, damaging his fences, *etc.* This was occasioned by ice-gorges which formed in the river during freezing weather, causing the waters to be diverted from the natural channel of the river. Starting at a point less than a quarter of a mile from the river bank on the Jeffers land, the ground is a few feet higher than the lowlands or meadow lands of this ranch, and upon this higher land is located the Jeffers house and other buildings, and on this land there are cultivated areas where he raises alfalfa and grain.

In January, February and March, 1917, the river gorged in the vicinity of the Jeffers place, and the water was diverted from the channel to and upon and over the Jeffers lands, covering, according to the testimony of the plaintiff, a larger area of his land than had ever been flooded theretofore, and damaging his lands, buildings, *etc.* However, according to plaintiff's own testimony, a few times prior to 1917 some of this higher land upon which he raised grain was flooded with ice and water occasioned by the gorging of the river during freezing weather. The principal difference between the flooding that occurred in January, February and March, 1917, and prior years, was that it covered a larger area of his ground. According to plaintiff's testimony, all of his lands, save and except about a half an acre, were submerged with ice and water.

Some of the witnesses testified that the turning of the water into the channel from the Hebgen reservoir caused shore ice, formed along the banks of the river, to be dislodged and carried down the stream with slush ice flowing therein, increasing the tendency of the river to gorge, while, on the other hand, many of plaintiff's witnesses testified that less ice flowed in the river during the winter months since the construction of the Hebgen dam than had theretofore.

There seems to be no dispute in the testimony that large quantities of water were released from the Hebgen reservoir into the Madison River during the period of time complained

of. The testimony also conclusively shows that there was a long protracted spell of cold weather.

At the close of the testimony the defendants moved separately for a directed verdict, and among other grounds in the several motions specify that the evidence fails to establish any negligence or negligent act on the part of the defendants, or either of them, upon which a verdict or a judgment could be predicated; that the evidence ''uncontradictedly shows that the construction and operation of said Hebgen dam and the storing of water therein, and the releasing of said water is, and has been, at all times, a lawful business, and the evidence fails to show that said business or any of the acts done in connection therewith has been negligently done or caused to be done; that the evidence uncontradictedly shows that the maintenance and construction of said Hebgen dam and reservoir, and the operation thereof, and the releasing of all waters which have been released therefrom, and the use of the channel of the Madison River as a conduit, was and is a lawful business, and that the owner and operator of said dam and all connected therewith, have conducted the same in a careful manner without negligence; and that the amount of water released from said Hebgen dam has never at any time been sufficient, together with the water naturally flowing in said river, to overflow the natural banks of said river at any point therein, and that the banks and channel of said river have at all times been sufficient to carry the water so released therefrom, together with the waters naturally flowing therein.'' The lower court sustained the motions and ordered the jury to find a verdict in favor of the defendants, to which the plaintiff excepted. Judgment was thereupon entered dismissing the action on the merits and awarding the defendants their costs. The plaintiff thereupon appealed from the judgment made and entered by the district court in favor of the defendants and against the plaintiff.

Numerous specifications of error are set forth in plaintiff's [1] brief, but in our opinion only those relating to the grant-

ing of the separate motions of the defendants for directed verdict need be considered.

In the argument to follow we will assume, but do not decide, that the Montana Power Company was responsible for the operation of the properties of the reservoir company.

In determining the question of the correctness of the ruling of the district court in granting the separate motions of the defendants for directed verdicts, we are at the outset confronted with the question: Is it necessary for the plaintiff under the facts disclosed in this case to allege and prove negligence upon the part of the defendants, or either of them, as the foundation of legal liability?

The plaintiff very earnestly contends that the defendants, under the facts disclosed in this case, are guilty of creating and maintaining a nuisance as defined by section 8642, Revised Codes of 1921, and that as, under this definition of a nuisance, negligence is not mentioned, he is relieved of the necessity of either alleging or proving negligence on the part of the defendants. This was the theory upon which the plaintiff tried his case.

The defendants with equal earnestness argue that, under the facts alleged in the complaint and disclosed by the evidence, the gist of the action is negligence, and until some negligence is shown there cannot be said to be any legal liability.

The section of the statute relied upon by plaintiff reads as follows: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance." (Sec. 8642, Rev. Codes 1921.)

Plaintiff contends for a literal construction of this statute, but as the statute is merely declaratory of the common law on

the subject (*State ex rel. Ford* v. *Young,* 54 Mont. 401, 170 Pac. 947), it must be construed in the light of the history on the subject.

That a nuisance may exist with or without negligence is too clear to require either argument or citations, but when negligence is a necessary element it is fraught with no little difficulty. Each case must be governed by its own facts, and no hard-and-fast rule can be laid down by which to determine when it is necessary to allege and prove negligence in an action for a nuisance.

The general rule is thus stated in 2 Wood on Nuisances, volume two, third edition, page 1276: "There are a class of actions for nuisances in which negligence must be alleged. As, for injuries arising from the undermining of buildings, by excavations upon adjoining lands; for injuries resulting from the explosion of steam boilers, of gunpowder; although in the latter case it seems that the keeping of large quantities in a populous locality, or near the dwellings of another, or near a highway, is a nuisance *per se,* rendering the owner thereof liable for all injuries resulting therefrom. So in actions against persons acting under legislative powers, unless the act is in excess of their powers, negligence should be alleged; as for injuries resulting from the flooding of lands, by the erection of an embankment, for the want of a proper culvert under the same, or turning surface water upon the premises of another, or preventing the drainage of lands when, by ditches and sluices, the injury could have been prevented; but except where the act is strictly within the scope of the grant, and the natural or probable consequence thereof, negligence is not an element, and need not be alleged. * * * The rule may be said to be, that, where a *lawful* act is done by an individual or corporation, there is no responsibility for the consequences, however injurious they may be, unless it was so done as to constitute actionable negligence. But it must be remembered that no act can be said to be lawful that is in violation of that venerable maxim *Sic utere tuo, ut alienum non laedas.* Every

person is bound to regard the *rights* of others, and any act that trenches thereon is actionable irrespective of the question of negligence. In the case of corporations, authorized by statute to do certain things, their acts are lawful as long as they act within the scope of the letter and spirit of the authority granted; therefore, in order to predicate a nuisance against them, it must either be alleged and proved that the act done, of which complaint is made, was wholly unauthorized, or that it was *negligently* done, and in either case, liability for the consequences exists in all grants of authority to do an act which may or may not be productive of injury to others accordingly as it is executed; the law presumes that it shall be done in such a manner as to be productive of the least possible injury, and if not so done, liability exists for the consequences * * * Generally where the thing complained of is in itself, or was originally lawful, but has become a nuisance because of its negligent use or management, negligence should be alleged and proved, or should clearly appear from the allegations in the complaint or declaration; consequently in that class of actions the complaint should set up negligence, and it must be established upon the trial, unless it is of such a character as to amount to negligence *per se.*" ·

In this connection we also call attention to the following provision of our statutes: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." (Sec. 8645, Rev. Codes 1921.)

In the case at bar we find that the operation of the Hebgen reservoir, the sale of the use of the water stored therein, and the transportation of such waters so stored through the channels of the Madison River for a useful purpose is authorized by statute and is a lawful business. (Secs. 7093, 7096, 7113, Rev. Codes 1921.) There can be no question under the facts in this case that the construction and operation of the Hebgen reservoir were done in accordance with the statutes. The impounding of the waters of the Madison River in the Hebgen reservoir and the transportation of them through the channels

of the Madison River for a lawful purpose, being a lawful business, it cannot be said that to do so is a nuisance *per se.* (29 Cyc. 1159.)

It is fundamental that without a wrong there is no cause of action, and, as stated by this court in the case of *Riddell* v. *Peck-Williamson H. & V. Co.*, 27 Mont. 44, 69 Pac. 241, "A wrong is the breach of a legal duty." It was therefore necessary for the plaintiff, in order to maintain his action against the defendants, to show a legal duty owing to him from them, and a breach of that duty. The mere fact that the plaintiff may have suffered damage is not of itself sufficient; there must be the violation of a duty recognized by law.

Having determined that the impounding of these waters and the transportation of them through the channels of the Madison River is not a nuisance *per se,* but a lawful business, it follows that if any of plaintiff's rights have been invaded by defendants it was due to the manner in which they carried on such business; in other words, that a nuisance was created by the negligent operation of an otherwise lawful business.

The duty owed by one impounding water and using the channels of a stream for a lawful purpose has been settled beyond question in this state and cannot be changed by changing the form or theory on which the action is brought.

That persons impounding waters are not insurers against **[2]** damage caused thereby, but are held only to the exercise of ordinary care in the construction and operation of their plants is so clearly and forcibly pointed out by Mr. Justice Holloway in the case of *Fleming* v. *Lockwood,* 36 Mont. 384, 122 Am. St. Rep. 375, 13 Ann. Cas. 263, 14 L. R. A. (n. s.) 628, 92 Pac. 962, that doubt can no longer exist as to the rule established in this state: "'A person may lawfully collect water by means of a dam, or in ditches, canals, culverts, or pipes, and is not liable in such a case for injuries caused by the escape of the water, in the absence of negligence on his own part.' (Gould on Waters, sec. 298.) 'The measure of the care which the ditch owner is bound to use is that which

ordinarily prudent men exercise under like circumstances when the risk is their own. And if he fails to exercise this degree of care, he is liable for injuries which the water causes to the adjoining property in consequence of his negligence.' "

Likewise, the measure of duty owed to others by one using the channels of a stream in this state for a lawful purpose is set at rest in the case of *Hopkins* v. *Butte etc. Co.*, 13 Mont. 223, 40 Am. St. Rep. 438, 33 Pac. 817. In that case the defendant company was using a stream known as Deep Creek for floating logs down to its mill at Great Falls. It cut and placed in the stream large quantities of logs, and in the transportation of the logs downstream a log jam or boom formed, causing a large quantity of water to be collected above, so that when the jam gave way the water so collected was suddenly released upon the plaintiff's lands and by depositing debris thereon caused damage to plaintiff's crops, fences, *etc*. The appellant requested the court to instruct the jury to the effect that in order for plaintiff to recover in the action he must show that defendant had been guilty of want of ordinary care and prudence in the conduct of its business upon this stream, and that plaintiff had sustained damage by reason thereof. This the court refused to do, instructing the jury that while defendant was engaged in a legitimate business yet it was bound to conduct its business in such a manner as not to cause injury to the plaintiff.

This court, in commenting upon the ruling of the court on the requested instruction, said: "The gist of this action is negligence, and until some negligence is shown there cannot be said to be any liability. * * * We think the instruction requested by appellant correctly stated the law of the case, and should have been given. [Citing cases.] The instruction given by the court practically ignored the question of negligence, and told the jury to find for the respondent for whatever damages he had sustained by the acts of the appellant in placing the logs in said stream, whether the appellant was guilty or not of any negligence or want of care in the con-

duct of its business, or whether the damage resulted from causes beyond appellant's control, and this, too, after instructing the jury that the appellant had a right to place its logs in said stream, and that it was engaged in a legitimate business. Ordinarily, if a person is engaged in a legitimate business, he is only liable to another for such injuries as result from negligence or the want of ordinary care and prudence in the conduct and management thereof."

In the legal principles applicable it would be impossible to distinguish this case from the one at bar. In the *Hopkins Case* the defendant was engaged in a lawful business, namely, using the channels of Deep Creek for the transportation of logs, and this court held that it owed to plaintiff the duty to exercise ordinary care in the conduct and management of its business, and no liability could attach except there be some showing of negligence or want of ordinary care resulting in damage to the plaintiff. In the instant case we find the defendants engaged in a lawful business, namely, using the channels of the Madison River for the transportation of the waters collected in the Hebgen reservoir and such use of the channel of the river authorized by the statutes. (Sec. 7096, Rev. Codes 1921.) In principle we fail to see why the same measure of care and responsibility should not attach in both cases. This being true, the failure of the plaintiff to allege and prove negligence on the part of the defendants is fatal to his action, call it by whatever name you will.

To adopt the theory advanced by the plaintiff, we would be obliged to hold that one impounding waters in this state and using the natural channel of a stream for the transportation of such waters is absolutely an insurer against all damages. This would place such an unreasonable burden on legitimate business as to practically discourage the reclamation of the state's arid lands and the development of many of our natural resources. Plaintiff contends that his right of action springs from the violation of the venerable maxim, "*Sic utere tuo, ut alienum non laedas,*" which has been translated by our code

(sec. 8743, Rev. Codes 1921) as follows: ''One must so use his own rights as not to infringe upon the rights of another.'' Plaintiff, however, overlooks the fact that the rule of law embodied in this maxim of jurisprudence is not ironclad and without limitations. As stated by Mr. Justice Holloway in *Fleming* v. *Lockwood, supra*: ''This maxim furnishes, in a general sense, the rule by which every member of society possesses and enjoys his property; but it is not an ironclad rule, without limitations. If applied literally in every case it would largely defeat the very purpose of its existence; for in many instances it would deprive individuals of the legitimate use of their property, and, for all practical purposes, destroy it. (*Hentz* v. *Long Island R. R. Co.*, 13 Barb. 646.)   The doctrine of the maxim is not inconsistent with the rule of law that a man may use his own property as he pleases, for all purposes for which it is adaptable, without being answerable for the consequences, if he is not an active agent in designedly causing injury, if he does not create a nuisance, or if he exercises due care and caution to prevent such injury.''

The defendants in impounding these waters in the reservoir and using the channels of the Madison River for the transportation thereof are no doubt subject to the rule embodied in this maxim; but it follows that no action can be maintained against them for the reasonable exercise of their right, although annoyance and injury may be occasioned the plaintiff. They are responsible only for injuries caused by their negligence, or those willfully inflicted. There is no pretense in this case that the injuries to plaintiff were willfully inflicted and no proof of negligence on the part of the defendants.

Some confusion may have existed in this state by reason of the decisions in several early cases, notably, *Fitzpatrick* v. *Montgomery*, 20 Mont. 181, 63 Am. St. Rep. 622, 50 Pac. 416. In that case defendant and subsequent appropriator of the waters of Buffalo Creek so conducted his placer mining operations above plaintiff's land that tailings and other debris were carried down that stream and deposited on plaintiff's land

damaging the same.    This court held that the question of negligence did not enter into the case and that defendant was liable for any damages caused to plaintiff in so conducting his placer mining operations regardless of the care exercised in attempting to prevent such damage.

But whatever doubt may have existed after the decision of the *Fitzpatrick Case* as to the duty owed to others by one using and handling waters in this state was definitely set at rest in *Fleming* v. *Lockwood, supra.*    In the latter case plaintiff sought to recover damages alleged to have been caused to his land by seepage from defendant's irrigating ditch.    Plaintiff asked the court to instruct the jury that if the injury was caused as alleged the verdict should be for plaintiff, irrespective of the question of negligence on the part of the defendant in the construction and operation of the ditch, which request the court refused to grant, and gave instead an instruction to the effect that defendant was only bound to exercise ordinary care in the construction and operation of his ditch, and that if he did so he could not be held responsible.    The action of the court in so instructing the jury was sustained in this court.    In the course of the opinion, the following observation was made concerning the decision in the *Fitzpatrick Case:* ''Since negligence is the very essence of an action of trespass on the case, and negligence was held not to enter into the *Fitzpatrick Case,* we must assume that the case was treated as an action of trespass, and of that character of such an action which is maintainable without reference to the question of negligence; in other words, the court must have held that Montgomery's situation was practically the same that it would have been had he hauled the debris in carts and deposited it upon Fitzpatrick's land, in which latter event, of course, the degree of care which he exercised would have been of no moment.    This, at least, is the theory of most of the cases cited in the opinion in the *Fitzpatrick Case;* and while it is a matter of doubt whether the *Fitzpatrick Case* was in fact of such character, it was evidently

treated as such, for upon no other possible theory can it be sustained.''

The court then discusses the difference between an action in trespass and an action for trespass on the case, stating that the former implies wantonness, malice or willfulness, while the latter implies only negligence, and then continues: ''But, whatever doubt may arise as to the character of the action applicable to the *Fitzpatrick Case,* there is no doubt or uncertainty whatever as to the class into which the case now under consideration falls. Upon the facts stated, it could only be maintained as an action of trespass on the case, since there is not any contention that Lockwood intentionally caused the water to seep from his ditch. If, in fact, the seepage occurred as plaintiff contends, it must have been the result of negligence on Lockwood's part, either in constructing or operating the ditch, since it is not contended that it was the result of an inevitable accident or was caused by an act of God; and therefore the plaintiff had the burden of proof, in the first instance, to show negligence on the part of the defendant.''

The principle of law announced in the *Fleming Case* was reaffirmed in the case of *Wine* v. *Northern Pac. Ry. Co.,* 48 Mont. 200, Ann. Cas. 1915D, 1102, 49 L. R. A. (n. s.) 711, 136 Pac. 387, where plaintiff sought to hold the railway company liable for the flooding of his land by reason of an ice jam alleged to have been caused by the railway company. It was there stated in the opinion by Mr. Chief Justice Brantly: ''If it commits a trespass, it is liable in an action for trespass. If during the conduct of its business it creates a nuisance or suffers one to exist upon its own property, it is liable in an action on the case. In the one case no question of diligence or skill can arise; liability will attach if the injury done is the result of the active agency of the defendant. In the other it will be liable if the injury is consequential or is the result of negligence or nonfeasance. [Citing *Fleming* v. *Lockwood, supra.*]''

In fact, plaintiff practically admits in the following language employed in his brief that negligence or want of ordinary care is the gist of the action: "As the evidence in the case shows, everybody knew the habit of the river to gorge, and under the foregoing authorities, when the defendants released quantities of water thereby suddenly increasing the flow of the river greatly above normal, the defendants should have anticipated the damage it was likely to do and because they did not anticipate it and forfend against it they are liable in this action."

If plaintiff desired to make defendants respond in damages under this rule, it was incumbent upon him to plead and prove that this was the habit of the river; that it was known to the respondents or in the exercise of reasonable care should have been known, that notwithstanding such knowledge the defendants negligently failed to anticipate such gorging, and negligently released the water knowing of the existence of the gorge or in the exercise of reasonable care being bound to anticipate its existence and thereby caused the injury complained of. And in fairness to the defendants they should have been advised by the pleadings and the proof that this was the issue they were required to meet, so that they might thereby have been enabled to properly prepare their defense.

The evidence produced by the plaintiff simply amounts to this: That defendants released, or caused to be released, from their reservoir during the months of January, February and March, 1917, when the temperature was below freezing, large quantities of the water stored therein, causing an unnatural fluctuation in the river every four or five days; this change in the river dislodged shore ice which, together with slush ice flowing therein, caused the river to gorge and flood plaintiff's ranch, possibly to a greater extent than it had theretofore, but, in its final analysis, producing a condition very similar to that which existed on the river during freezing weather nearly every year before the dam was built, damaging plain-

tiff's land and other property to a greater extent than had been suffered by him theretofore.

Further, the injury complained of in this case cannot be traced directly to the construction, operation or maintenance of the Hebgen reservoir. The testimony shows conclusively that no more water was turned into the river, when added to that naturally flowing therein, than could safely be accommodated by the natural channels of the river, and that the flooding of plaintiff's land was occasioned by an ice-gorge which had formed in the river; the damage therefore was not direct, but consequential. Or, to put it in another way, there is no causal connection between the operation of the reservoir and the using of the channel of the river for the transportation of the water stored therein and the flooding of plaintiff's land. In order to make out a case, the burden was on the plaintiff to allege and prove some negligence which proximately caused the injury of which complaint is made.

In this connection we desire to quote the following language taken from the opinion of the court in the case of *Town of Lawrence* v. *American etc. Co.*, 144 Wis. 556, 128 N. W. 440: "Has the defendant by the use of its flush-boards so manipulated the water as to incur any liability to plaintiff? The flush-boards have been used on the dam only when the water was at a low stage, caused either by natural conditions or by the holding back of the water by upper mill owners. At no time has the use of flush-boards caused the river to rive [rise] above ordinary high-water mark; that is, the point up to which the presence and action of the water is so continuous as to leave a distinct mark either by erosion, destruction or vegetation, or other easily recognized characteristic. The water has always been controlled within the natural limits of the stream and within the limits of its ordinary high and low water marks, and such control has been rendered necessary by the lawful and proper use of the water by upper proprietors of mills, or by natural causes. Such use, within such limits and under such circumstances, is a lawful use. The owner of water-power

is entitled the whole year round to the use of the stream and the banks below ordinary high-water mark as nature has created them, subject to a reasonable use thereof by other owners of power and of riparian rights. And he may in a season of low water, by artificial means, restore the stream to a condition of a higher stage of water than then exists, provided he does not raise it above ordinary high-water mark, and provided such restoration is reasonably necessary to the full enjoyment of his water rights, and it creates no essentially different conditions than would exist had there been a natural rise of the stream to the same extent and for the same length of time. A mere riparian right is subject to such reasonable use of the stream, and if any damage results therefrom the owner of the right is without a remedy. (2 Farnham on Waters, 276; Gould on Waters, sec. 218; *Timm* v. *Bear,* 29 Wis. 254; *Coldwell* v. *Sanderson,* 69 Wis. 52, 28 N. W. 232, 33 N. W. 591.)

"The defendant made no new or unusual use of the stream, nor did it create conditions essentially different from those that would have resulted from the upper proprietors holding the water back at stated intervals without any ponding thereof on its part. The intermittent breaking and freezing of the ice from which the greater damage resulted was caused as much by the action of the upper mill owners as it was by that of the defendant, and it is a verity in the case that some damage would have been done to the highway if neither the upper proprietors nor the defendant had manipulated or controlled the water in any respect. The location of the highway with reference to the river was such that the damage sustained might be said to be a natural and necessary incident thereto. It was the combined action of the upper proprietors in periodically shutting off the flow of water, of the defendant in then ponding it, and of nature in freezing and expanding it under such changing conditions, together with the natural stage of high water in the spring when the ice was carried away, that

caused the damage.   Under such circumstances, the defendant, whose use of the water was lawful, cannot be held liable.''

In view of the foregoing it becomes unnecessary to review the authorities cited by the plaintiff in his brief.   The court properly sustained the separate motions for directed verdicts.

Specifications of error Nos. 26 to 32, both inclusive, have to [3]   do with the action of the trial court in refusing to strike certain items from the memorandum of costs, and, while we are not disposed to interfere with the ruling of the lower court, yet brief mention of this matter seems desirable.

Specification of error No. 26 challenges the correctness of the ruling of the court in refusing to strike from the memorandum of costs the item of $521.92 claimed by defendants for making a topographical map showing the topography of the land of the plaintiff and surrounding land to which reference is made in the pleadings in this case.   One of the objections urged against this item is that the map was prepared before this suit was filed and was not made in order to prepare a defense to this or other suits.   It is also objected that the charge made is excessive, and that if the item is a proper charge no more than one-eighth thereof should be taxed against the plaintiff, as seven others have similar suits pending in which this map could be used.

Mr. J. C. Stevens, a consulting engineer, caused to be made a survey of the Madison Valley for the purpose of determining the cause of the ice gorging or winter overflow problem on the Madison River.   Mr. Don C. Merriott, a surveyor, made the survey, and also what is known as a plane-table map while on the ground, and the map for which a charge is made in the memorandum of costs and which the court allowed as a proper item of costs incurred by defendants, is a tracing of this original or plane-table map.   It is true, as stated by Mr. M. M. Duncan in his affidavit in support of the motion to tax costs, that the survey and the original map were made prior to the institution of the present action, and this was the testimony of Mr. Stevens, who caused the survey to be made; but in the

affidavits in opposition to the motion to tax costs it is stated positively that the map introduced and received in evidence, and for which the charge is made in the cost bill, was made after the institution of the present action and for the purpose of being used on the trial thereof. This uncontradicted statement in the defendants' affidavits also disposes of the contention that if this is a proper charge plaintiff should only be required to pay a portion thereof, as there are other suits pending of like character in which the map could be used.

As to the reasonableness of the charge for making the map, [4, 5] there is a direct conflict in the affidavits in support of and in opposition to the motion to tax costs. Mr. Duncan states in his affidavit that $150 would be a reasonable charge for making the map, while the affidavits of the defendants affirm that the charge made in the memorandum of costs is reasonable and proper. This matter may be disposed of by the following pertinent observation made in the case of *Kelly* v. *City of Butte,* 44 Mont. 115, 119 Pac. 171: "The question of fact raised by the affidavit just quoted was for the district court to decide. The original memorandum, verified as it was, was *prima facie* evidence that the amounts named therein were necessarily expended. The burden of overcoming such showing was on the defendant. The district court found that the burden had not been sustained, and we are not disposed to interfere with the finding. [Citing cases.]"

Specifications of error numbered 27 to 32, both inclusive, assign as error the refusal of the lower court to strike from the memorandum of costs items of witness fees and mileage of six witnesses, because they did not testify on the trial.

The affidavit of Mr. M. M. Duncan, in support of the motion, states that these witnesses were never called or examined as witnesses during the trial of this case, and no showing was made on the part of the defendants that the testimony which the witnesses were expected to give could reasonably be offered as relevant, competent or material to the issues raised for trial.

This memorandum of costs duly verified and filed made out

a *prima facie* case as to the correctness of the items of disbursement therein contained. (*Hoskins* v. *Northern Pac. Ry. Co.,* 39 Mont. 394, 102 Pac. 988.) The burden then devolved upon the plaintiff to refute this *prima facie* showing, and to show that the items were not correct.

The affidavits of J. V. Dwyer, Frank Scotten, J. E. Bell [6] and F. W. Bird, in opposition to the motion, show that these witnesses were actually present in court at the instance of the defendants and prepared to testify on each day for which witness fees were charged, and that they actually traveled the distance for which mileage was charged. It further appears from these affidavits that the testimony which these witnesses were prepared to give was competent, relevant and material to the issues raised by the pleadings, and the reason why these witnesses were not called is that plaintiff failed to offer proof as to some of the issues raised by the pleadings.

The defendants were required to be prepared to meet all the issues raised by the pleadings, as well as to prove their own case, and the fact that plaintiff did not offer proof as to some thereof, concerning which these witnesses were prepared to testify, does not deprive defendants of the right to the fees which were necessary to bring these witnesses into court. (*Berry* v. *City of Helena,* 56 Mont. 122, 182 Pac. 117.) The above items of cost objected to were properly allowed.

Several rulings on the admission and rejection of testimony are challenged, but the disposition we are obliged to make of this case renders consideration thereof unnecessary.

The judgment is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES COOPER, HOLLOWAY, GALEN and STARK concur.